The CITY OF WACO, et al.,
Appellants,

v.

Johnny HESTER, Appellee.

No. 10–89–087–CV.

Court of Appeals of Texas,
Waco.

Nov. 29, 1990.

Rehearing Overruled Feb. 14, 1991.

James Ludlum, Jr., Ludlum & Ludlum, Austin, Annette Jones, Asst. City Atty., Waco, for appellants.

Derrel Luce, Waco, for appellee.

## OPINION

THOMAS, Chief Justice.

Johnny Hester, claiming that he was homosexually raped by another inmate while in the Waco jail, sued the City of Waco and Police Chief Larry Scott under the Texas Tort Claims Act and § 1983 of Title 42 of the United States Code. *See* TEX.CIV. PRAC. & REM.CODE ANN. §§ 101.-001–.109 (Vernon 1986 and Vernon Supp. 1990); 42 U.S.C.A. § 1983 (West 1981). He recovered a judgment against the City for $270,416.13 in damages, plus post-judgment interest, costs, and $97,500 in attorney's fees. No judgment was entered against Scott.

A pivotal question related to the Tort Claims Act is whether Hester's claim arose out of an intentional tort or the failure to provide police protection. *See* TEX.CIV. PRAC. & REM.CODE ANN. §§ 101.055(3), 101.057(2) (Vernon Supp.1990 and Vernon

1986). Other points involve the evidentiary support for liability findings, damages, and attorney's fees, and Scott's contention that he was entitled to attorney's fees under § 1988 as a "prevailing party."[1] *See* 42 U.S.C.A. § 1988 (West 1981). Recovery under the Tort Claims Act will be sustained, but recovery under § 1983 will be denied. Therefore, the judgment will be reformed to reduce Hester's recovery of damages from $270,416.13 to $250,000, the City's maximum liability under the Tort Claims Act, and to delete all attorney's fees. The reformed judgment will then be affirmed.

## THE ASSAULT AND ITS AFTERMATH

Viewing the evidence in the light most favorable to the verdict, the jury could have reasonably concluded that the following occurred on September 7, 1986. Shortly after lunch, Don Davis homosexually raped nineteen-year-old Johnny Hester in the shower area of the Waco jail's "dayroom." Hester was "laying out" his fine on a misdemeanor theft conviction for failing to pay for $5.00 of gas at a convenience store. Davis was awaiting transfer to the county jail on charges that he had sexually assaulted two female Baylor students. He threatened and intimidated Hester before assaulting him, and afterwards threatened to kill him if he told anyone. Hester suffered severe emotional distress from the assault prior to the trial, and will continue to suffer mental anguish.

## INTENTIONAL–TORT EXEMPTION

The Texas Tort Claims Act waives governmental immunity on claims arising out of the "negligence of an employee acting within his scope of employment." TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(1) (Vernon 1986). However, the Act does not apply to a "claim arising out of assault, battery ... or any other intentional tort." *Id.* at § 101.057(2). In other words, the Act does not waive governmental immunity if the intentional-tort exemption applies.

The City's first point is that it was entitled to a judgment notwithstanding the verdict because Hester's claim arose out of an intentional tort as a matter of law. Relying on a case interpreting a similar exemption in the Federal Tort Claims Act, Hester argues that his claim arose out of the City's negligence, not an intentional tort, and that the exemption only applies to intentional torts committed by government employees. *See Sheridan v. United States*, 487 U.S. 392, 108 S.Ct. 2449, 2454–55, 101 L.Ed.2d 352 (1988). He points out that the person who raped him was not a city employee. As authority for its contention that the exemption applies to intentional torts committed by third parties as well as government employees, the City cites *Trevathan v. State*, 740 S.W.2d 500, 502 (Tex.App.—Houston [1st Dist.] 1987, writ denied). A more recent decision clearly supports the City's argument. *See Delaney v. University of Houston*, 792 S.W.2d 733, 735 (Tex.App.—Houston [14th Dist.] 1990, writ granted). However, the Supreme Court granted a writ of error in *Delaney*. 34 Tex.Sup.Ct.J. 48 (Oct. 27, 1990).

Disposition of point one will necessarily turn upon what the legislature intended when it adopted the Tort Claims Act in 1969. Several well-established rules of statutory construction will guide the determination of legislative intent.

One must presume that the legislature was aware of the law when it enacted the Tort Claims Act. *See Acker v. Texas Water Com'n*, 790 S.W.2d 299, 301 (Tex.1990). Prior to the Act's adoption, a city was immune from liability for injuries to inmates resulting from the negligence of its jailers. *Strickland v. City of Odessa*, 268 S.W.2d 722, 723 (Tex.Civ.App.—El Paso 1954, no writ); *Stinnett v. City of Sherman*, 43 S.W. 847, 849 (Tex.Civ.App.1897, no writ). However, jailers were individual-

---

1. Hester contends that the City waived any error by failing to comply with the briefing rule. *See* TEX.R.APP.P. 74. Points of error with accompanying references to the record were fully stated in the front of the brief, but were not re-stated in the body of the brief. Substantial compliance with the briefing rule is all that is required. *Id.* at 74(p). Hester's contention is overruled.

ly liable for their negligence. *Browning v. Graves,* 152 S.W.2d 515, 519 (Tex.Civ.App. —Fort Worth 1941, writ ref'd).

Another fundamental rule of construction requires legislative intent to be gleaned from the Act's language if possible. *See Minton v. Frank,* 545 S.W.2d 442, 445 (Tex.1976). Consideration must be given to the legislature's stated intent in adopting the Act and the remedy chosen to achieve it. *See* TEX.GOV'T CODE ANN. § 312.005 (Vernon 1988). The legislature's manifest objective is stated in explicit language: to abolish governmental immunity on claims arising out of the "negligence of an employee acting within his scope of employment." TEX.CIV.PRAC. & REM. CODE ANN. §§ 101.025, 101.021(1) (Vernon 1986). The Act must be liberally construed to achieve that objective. *Robinson v. Central Texas MHMR Center,* 780 S.W.2d 169, 170 (Tex.1989).

Unlike the crystal-clear language waiving governmental immunity on negligence claims, the language of the intentional-tort exemption does not explicitly signal legislative intent. Did the legislature intend, by inserting the exemption, to retain governmental immunity on claims arising out of a jailer's negligence, when the result of that negligence and the means of injury fortuitously happened to be an intentional tort? Although the language of the exemption is broad enough to achieve that result, such a construction defeats the clearly expressed legislative intent to waive immunity on negligence claims. That result must be avoided. *See Unigard Sec. Ins. Co. v. Schaefer,* 572 S.W.2d 303, 307 (Tex.1978). Moreover, applying the exemption to intentional torts committed by third parties gives it an expansive effect, which violates the rule that exemptions are not to be enlarged by construction. *See Heard v. Heard,* 305 S.W.2d 231, 235 (Tex.Civ.App. —Galveston 1957, writ ref'd). Only by strictly construing the exemption can the

Act be liberally construed in favor of the waiver of immunity on negligence claims.

A narrower construction of the exemption, one in harmony with its language and supportive of the legislature's manifest objective, is to limit its effect to intentional torts committed by government employees. This interpretation avoids the incongruity of an inmate being able to sue for injuries proximately caused by a jailer's negligence, if the injury is inflicted by means other than an intentional tort, but being barred from recovery if the jailer's negligence results in an intentional tort. Legislative intent can also be discerned by juxtaposing the Federal Tort Claims Act and the Texas Tort Claims Act. Both waive governmental immunity and then provide certain exemptions which, when applicable, preserve it. Furthermore, each contains substantially similar exemptions for intentional torts.[2] *See* 28 U.S.C.A. § 2680(h) (West Supp. 1990); TEX.CIV.PRAC. & REM.CODE ANN. § 101.057(2) (Vernon 1986).

Fifteen years prior to the adoption of the Texas Tort Claims Act, the exemption in the federal act was given the same narrow construction, thereby limiting its application to claims arising from intentional torts by government employees. *Panella v. United States,* 216 F.2d 622, 624–25 (2nd Cir.1954); *see also Rogers v. United States,* 397 F.2d 12, 15 (4th Cir.1968). The United States Supreme Court ruled in 1963 that a prisoner could sue under the Federal Tort Claims Act for injuries sustained in a beating by other inmates allegedly resulting from the negligence of a federal employee. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 1851, 10 L.Ed.2d 805 (1963). Curiously, the Court never discussed the intentional-tort exemption, other than noting that the federal government is not liable for the intentional torts of "its employees." *Id.* 83 S.Ct. at 1858. However, the result in *Muniz* could have been reached only by the Supreme Court implicitly limiting the exemption to intentional

---

**2.** "The provisions of [the Federal Tort Claims Act] shall not apply to ... (h) any claim arising out of *assault [or] battery*." 28 U.S.C.A. § 2680(h) (West Supp.1990) (emphasis added). "[The Texas Tort Claims Act] does not apply to a

claim ... (2) arising out of *assault, battery, ... or any other intentional tort.*" TEX.CIV.PRAC. & REM.CODE ANN. § 101.057(2) (Vernon 1986) (emphasis added).

torts committed by federal employees. The decisions in *Panella, Muniz* and *Rogers* all predated the adoption of the Texas Tort Claims Act in 1969.

In 1988 the United States Supreme Court expressly limited the exemption's application to intentional torts by federal employees. *Sheridan,* 108 S.Ct. at 2454–55. It adopted the analysis in *Panella* and recognized that the holding in *Muniz* could best be explained by limiting the exemption's application to cases arising out of assaults by federal employees. *Id.*

Considering the similarity of the exemptions, a presumption exists that the legislature intended, when it included the exemption in the Texas Tort Claims Act, to likewise adopt the narrow construction theretofore placed on the federal exemption by federal courts. *See State v. Klein,* 154 Tex.Crim. 31, 224 S.W.2d 250, 253 (1949); *Blackmon v. Hansen,* 140 Tex. 536, 169 S.W.2d 962, 964–65 (1943). Nothing in the Texas Tort Claims Act indicates that a contrary or more expansive construction of the exemption was intended. Thus, the construction in *Panella* and *Rogers,* and the implicitly narrow construction in *Muniz*—all predating the adoption of the Texas Tort Claims Act—must be considered in determining legislative intent. *See id.*

Based upon the Act's explicit language and the applicable rules of construction, the legislature intended to restrict the exemption's application to claims arising out of intentional torts committed by government employees. Limiting the exemption in this manner conflicts with the holdings of two other courts of appeal. *Delaney,* 792 S.W.2d at 735 (negligence suit against a state university by a student who was raped by an unknown assailant); *Trevathan,* 740 S.W.2d at 502 (suit against the state by a person who was attacked by an unknown assailant at a state park). As noted earlier, the Texas Supreme Court has agreed to review the holding in *Delaney.* 34 Tex.Sup.Ct.J. 48 (Oct. 27, 1990). However, to the extent that these decisions expressly or implicitly apply the exemption to intentional torts committed by third per-

sons, they conflict with legislative intent and will not be followed.

■ Hester's claim was not one "arising out of" an intentional tort. Instead, his claim arose out of the antecedent negligence of the City's employees. *See Sheridan,* 108 S.Ct. at 2454. Negligence was the asserted basis of his cause of action. The intentional tort and Hester's damages proximately resulted from the City's negligence. *Id.* Thus, the court did not err when it denied the City's motion for a judgment notwithstanding the verdict. Point one is overruled.

## POLICE–PROTECTION EXEMPTION

The Texas Tort Claims Act also does not apply to claims arising out of the "failure to provide or the method of providing police ... protection." TEX.CIV.PRAC. & REM. CODE ANN. § 101.055(3) (Vernon Supp. 1990). If this exemption were applicable, as the City contends in point two, then governmental immunity was preserved and the City was entitled to a judgment notwithstanding the verdict.

■ The police-protection exemption only applies to claims arising out of the negligent formulation of governmental policy, not out of the negligent implementation of formulated policy. *State v. Terrell,* 588 S.W.2d 784, 787–88 (Tex.1979). Thus, the crucial question is whether Hester's claim arose out of the negligent implementation of formulated policy. *See Norton v. Brazos County,* 640 S.W.2d 690, 693 (Tex.App.—Houston [14th Dist.] 1982, no writ); *Forbus v. City of Denton,* 595 S.W.2d 621, 623 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.).

■ Hester introduced into evidence the City's written policies which required jail personnel to protect inmates from harm and to segregate inmates known to be dangerous or homosexual for purposes of control, discipline or health reasons. Isolation of an inmate was within the jailers' discretionary authority. Hester alleged that: (1) the City's officers and jailers either knew or should have known of Davis' violent and homosexual tendencies; (2) the jail lacked

adequate facilities for segregating inmates; and (3) the City failed to transfer Davis to the county jail where he could be adequately segregated. These allegations were referable to the implementation of the segregation policy.

Other allegations related to the implementation of the policy of protecting inmates from harm: (4) the jail lacked adequate facilities for monitoring inmates; (5) jailers were allowed to watch commercial television at the "booking desk"; (6) jailers were not given any training before being assigned to duty; and (7) jailers were warned prior to the assault that Davis was intimidating Hester but they ignored the warning. Finally, Hester asserted that his injuries were proximately caused by these negligent "actions and policies," which involved a condition or use of tangible personal or real property.[3] The jury found that his injuries were proximately caused by the City's negligent "implementation of [policies] concerning the use of ... tangible personal or real property."

Fairly characterized, Hester's allegations were that his injuries arose out of the negligent implementation of the City's policies. He was not complaining about negligence in the formulation of policy. Accordingly, the police-protection exemption was not applicable, and the court did not err when it refused to enter a judgment notwithstanding the verdict. *See Terrell*, 588 S.W.2d at 787; *Forbus*, 595 S.W.2d at 623.

The City relies on *Trevathan* to support its argument that Hester's claim was based on the failure to provide police protection. *See Trevathan*, 740 S.W.2d at 502. There, the plaintiff was attacked while showering in a bath house at a state park. *Id.* at 501. She alleged that the state: (1) "knew, or should have known, that dangerous persons entered the premises after the security guard left the premises"; (2) failed "to provide adequate security"; and (3) failed "to lock the entry gate, to provide locks for the bath house, to provide proper lighting,

and to provide adequate patrolling." *Id.* at 502. Holding that the "essence" of her claim was that the state had failed to provide adequate police protection at the park, the court sustained a summary judgment in favor of the state based on the police-protection exemption. *Id.*

The allegations in *Trevathan*, in which negligence was apparently never expressly alleged as a basis for a recovery, are not analogous to those here. The essence of Hester's allegations was the negligent implementation of formulated policies. However, to the extent that *Trevathan* can be interpreted as holding that the police-protection exemption applies to a claim arising out of the negligent implementation of formulated policy, it will not be followed because of a conflict with *Terrell*. *See Terrell*, 588 S.W.2d at 787. Point two is overruled.

## EVIDENTIARY POINTS UNDER THE TORT CLAIMS ACT

█ The jury found that Hester had been sexually assaulted. Under point five the question is whether factually sufficient evidence supported this finding. All of the evidence has been considered in disposing of this point. *See Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

"Sexual assault" was defined in the charge as anal intercourse without Hester's consent. Hester claimed that he did not consent; Davis testified that Hester consented. Another inmate who witnessed the assault said that Hester had been forced to participate against his will. A medical examination failed to find any physical evidence of forced anal intercourse. However, a psychologist treating Hester testified that his symptomatic behavior indicated he had been assaulted without his consent. Davis plead guilty to sexually assaulting Hester without consent, and received a twenty-year prison sentence for the offense. Hester's testimo-

---

**3.** The Tort Claims Act waives governmental immunity in three general areas: (1) claims arising out of the use of motor-driven vehicles and motor-driven equipment; (2) claims arising from some condition or use of tangible personal property; and (3) claims arising from some condition or use of real property. TEX.CIV. PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986).

ny alone, which the jury had a right to believe, provided factually sufficient evidence to support the finding that he was sexually assaulted. Point five is overruled.

The jury also found that the sexual assault was proximately caused by the City's negligent implementation of a policy concerning the "use of ... tangible personal or real property." Points three and four, attacking the evidentiary support for the proximate-cause finding, will be reviewed under the applicable standards. *See id.; Stanglin v. Keda Development Corp.,* 713 S.W.2d 94, 95 (Tex.1986).

■ Proximate cause consists of two elements: foreseeability and cause-in-fact. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 549 (Tex.1985). Foreseeability means that a person of ordinary intelligence can reasonably anticipate the dangers that his negligent act or omission created for others. *Id.* at 549–50. The City first argues that the evidence was legally and factually insufficient to show that the jailers could reasonably foresee that Hester would be sexually assaulted by Davis.

■ A criminal act can be the reasonably foreseeable result of a negligent act. *Id.* at 550. Chief Scott admitted that before an inmate is placed in jail the jailers should be informed that he has violent or homosexual tendencies. This is vital information because of the reasonably foreseeable danger that a violent or homosexual inmate may injure others. Based on common sense and experience, one can reasonably foresee that a jailer's negligent act may result in an inmate being physically attacked by another prisoner.

Hester's evidence tended to show that Waco police officers either knew or should have known that Davis was a violent homosexual. Several officers and a deputy sheriff testified that Davis had a reputation for violence and that he was generally known by officers to be a homosexual. In fact, Davis claimed he told a detective that he was a homosexual just before being placed in jail. However, the jailers said that they never received this information. The detective testified that Davis was calm when she interrogated him just before he was placed

in jail, and also denied that Davis ever told her he was a homosexual. Michael Parker, who was in jail with Hester, said he warned the jailers before the assault that "something was fixing to come down." The jailers disputed Parker's testimony. The City's evidence tended to show that the jailers had no reason to believe that Davis, who was facing charges of heterosexual rape, was a sexual threat to other inmates. This was the only incident of homosexual rape in the jail; at least there was no evidence of other sexual attacks. This evidence was legally and factually sufficient to support a finding that the sexual assault was a reasonably foreseeable result of the negligent implementation of the segregation and inmate-protection policies.

■ Next, the City attacks the cause-in-fact element of proximate cause. A negligent act or omission is a cause-in-fact if it was a substantial factor in bringing about the injury and without which act or omission no harm would have resulted. *Id.* at 549. Specifically, the City argues that the evidence is legally and factually insufficient to show that Hester's injuries were proximately caused by a negligent act or omission involving the "use" of tangible personal or real property.

■ The Tort Claims Act waives governmental immunity on claims arising from the *condition or use* of tangible personal or real property. TEX.CIV.PRAC. & REM. CODE ANN. § 101.021(2) (Vernon 1986). Hester alleged that his injuries were proximately caused by negligent actions involving a "condition or use" of tangible personal or real property. However, the question was framed in a way that the jury found the sexual assault was proximately caused by the "use" of tangible personal or real property. "Use" means "to put or bring into action or service; to employ for or apply to a given purpose." *Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 33 (Tex. 1983). A finding of "use" does not require proof that the property used was either defective or inadequate. *Id.* at 32.

As noted earlier, the City had formulated policies to segregate violent or homosexual

prisoners from other inmates and to protect inmates from harm. The dayroom was used to house all inmates during the day. Except for the bathroom area, video cameras monitored activities in the dayroom, and jailers could observe dayroom activities on television monitors located at the booking desk. A steel door separated the inmate and dayroom area from the booking area.

The evidence was both legally and factually sufficient for the jury to have reasonably concluded that the police officers either knew or should have known that Davis had violent, homosexual tendencies, but that the jailers were not given this information. Likewise, the evidence was legally and factually sufficient for the jury to have reasonably found that, (1) by "using" the dayroom to house Davis with other male inmates, the City negligently implemented the segregation and inmate-protection policies, and (2) its negligence was a substantial factor in bringing about the sexual assault and without which it would not have occurred.

Furthermore, there was evidence that the steel door separating the dayroom and jail area from the booking desk was closed when the sexual assault occurred, that this could have interfered with the jailers' auditory surveillance of inmate activities, and that the jailers also could have been distracted by watching commercial television at the booking desk. Other evidence indicated that jailers could hear conversations in the dayroom even with the steel door closed, and that the television set had not distracted them from monitoring dayroom activities. This conflicting evidence was legally and factually sufficient for the jury to have reasonably concluded that, (1) by "using" the steel door and television set in this manner, the jailers negligently implemented the inmate-protection policy, and (2) their negligence was a substantial factor in bringing about the sexual assault and without which it would not have occurred. Thus, the cause-in-fact element of proximate cause was supported by legally and factually sufficient evidence showing that the negligent implementation of the policies involved the "use" of tangible personal or real property. Points three and four are overruled.

█ In response to the third question, the jury answered "No" when asked whether the sexual assault was proximately caused by Hester's negligence. The contention under point six is that the "No" answer was against the great weight and preponderance of the evidence. All of the evidence was considered in disposing of this contention. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) (on rehearing).

Hester testified that Davis began hitting and threatening him and other inmates as soon as Davis was placed in the dayroom, that he entered the shower area when Davis told him to only because he was afraid of him, and that Davis hit him, overpowered him, and sexually assaulted him without his consent. He claimed that he yelled for help while being attacked. Another inmate corroborated his testimony. However, the City's evidence and cross-examination suggested that Hester could have prevented the attack by yelling for help when Davis began intimidating and threatening him, while being forced into the shower area or while being beaten just prior to the assault.

Considering all of the evidence, the failure to find that Hester was contributorily negligent was not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See id.* Consequently, the jury did not err when it failed to answer the comparative-negligence question, which was conditionally submitted on an affirmative answer to the third question. Point six is overruled.

### § 1983 CLAIM

A necessary element in a § 1983 cause of action is proof of a constitutional violation. 42 U.S.C.A. § 1983 (West 1981). The jury found that the City violated Hester's Eighth Amendment right to be free from cruel and unusual punishment. *See* U.S. CONST. amend. VIII. The City questions the evidentiary support for this finding in points seven through ten.

A prisoner has a right under the Eighth Amendment to be reasonably protected from the constant threat of violence and sexual assault by fellow inmates. *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir.1973). However, cruel and unusual punishment is characterized by the "unnecessary and wanton infliction of pain," not by mere negligence or inadvertence. *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). "Wantonness" means "deliberate indifference" or "recklessness in criminal law." *Id.* 106 S.Ct. at 1085. "Deliberate indifference" or "recklessness" is reflected by a "complete indifference to risk" or a "conscious disregard ... [that] manifests extreme indifference to the value of human life." *Archie v. City of Racine,* 847 F.2d 1211, 1219 (7th Cir.1988).

There was evidence of occasional fights between inmates. Some violence between prisoners is unavoidable. *Martin v. White,* 742 F.2d 469, 475 (8th Cir.1984) (citing *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). However, there was no evidence that inmates faced a pervasive risk of sexual assault or harm from fellow prisoners. A pervasive risk of harm arises when inmates are assaulted by other prisoners with such frequency that there is a reasonable fear for their safety and jail personnel are reasonably apprised of the existence of the threat to inmate safety and the need for protective action. *See Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.1980). Hester's sexual assault was a single, random, isolated incident. A random act of violence does not create a pervasive risk of harm. *Benson v. Cady,* 761 F.2d 335, 340 (7th Cir. 1985).

Michael Parker, who was in jail with Hester, testified that he warned jailers before the rape occurred that "they had better either move [Hester] or Don Davis because something was fixing to come down." The jailers denied ever being given this warning. However, assuming that the statement was made to the jailers, was Parker warning them that Davis was a threat to Hester or vice versa? Considering its ambiguity, the jailers did not have actual notice that Davis was about to assault Hester, i.e., that a sexual assault on Hester was "fixing to come down." Even if they had actual knowledge that Davis was a threat to Hester's safety, the record does not contain any evidence of "deliberate indifference" or "recklessness" on their part. Evidence of negligence or poor judgment, yes, but not an "unnecessary and wanton infliction of pain." Accordingly, the evidence was legally insufficient to support a finding of cruel and unusual punishment, and points seven through ten are sustained.

Nevertheless, even if a constitutional violation were proven, it had to stem from the execution of an official "policy or custom" before the City could be liable under § 1983. *See Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Government policy or custom must be the "moving force of the constitutional violation." *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). The jury found that the actions subjecting Hester to cruel and unusual punishment were performed in accordance with "official policies or customs." This finding is attacked in points eleven through fourteen.

Clearly, the City did not have an affirmative policy or custom of knowingly allowing dangerous inmates, homosexual or otherwise, to remain unsegregated in the dayroom in the face of a pervasive risk to other prisoners. In fact, its written policy gave jailers discretionary authority to segregate such prisoners under those circumstances, a policy not unconstitutional on its face. When a constitutional violation allegedly stems from actions or inaction pursuant to a facially constitutional policy or custom, proof of a single, isolated incident of unconstitutional activity is insufficient to establish the requisite fault and causal connection between the official policy or custom and the constitutional violation. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Thus, Hester's proof of a single incident of sexual assault was legally insufficient to establish a causal

connection between the execution of an official policy or custom and a violation of his Eighth Amendment right, assuming that such occurred. Accordingly, points eleven through fourteen are sustained.·

Point fifteen is that the City was entitled to a judgment notwithstanding the verdict on the ground the evidence conclusively established that it operated the jail under the discretionary application of its policies and customs. This point is not reached.

The City was not liable under § 1983 as a matter of law because there was no evidence of a constitutional violation or, assuming that one occurred, any evidence that an official policy or custom of the City was "the moving force of the constitutional violation." *See Polk County*, 102 S.Ct. at 454. Accordingly, the court erred when it refused to grant the City a judgment notwithstanding the verdict on Hester's § 1983 claim.

### HESTER'S ATTORNEY'S FEES

Having succeeded under the Tort Claims Act, which does not provide for the recovery of attorney's fees, Hester nevertheless failed to prevail on his § 1983 claim. He was not entitled to recover attorney's fees because only a "prevailing party" may recover attorney's fees under § 1988. *See* 42 U.S.C.A. § 1988 (West 1981); *McDonald v. Doe*, 748 F.2d 1055, 1057 (5th Cir.1984). Therefore, the judgment will be reformed to delete any recovery of attorney's fees, and a take-nothing judgment will be rendered in favor of the City on Hester's § 1983 claim. Points nineteen through twenty-one, questioning the evidentiary support for Hester's attorney's fees, are not reached.

### SCOTT'S ATTORNEY'S FEES

Judgment was not rendered against Scott because, although sued as a defendant, no questions referable to his individual liability were submitted to the jury. He claims that he was a prevailing defendant and that the court abused its discretion when it refused to award him attorney's fees under § 1988.

■ Attorney's fees should be awarded under § 1988 to a prevailing defendant only when the plaintiff's claim is frivolous, unreasonable or groundless. *Fidelity Guarantee Mortg. Corp. v. Reben*, 809 F.2d 931, 935–36 (1st Cir.1987) (relying on *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)). Hester's § 1983 claim was neither frivolous, groundless nor unreasonably prosecuted, and the refusal to award Scott attorney's fees was not an abuse of discretion. Scott's cross-point, denominated point twenty-two, is overruled.

### DAMAGES

The charge authorized the jury to assess damages for past and future (1) physical pain and mental anguish, (2) loss of earning capacity, (3) physical impairment, and (4) medical care. However, it did not allow the jury to specify separate amounts for each element of damage. The jury awarded Hester $102,000 for past damages and $150,000 for future damages. The City questions the evidentiary support for these findings and seeks a remittitur of excessive damages in points sixteen through eighteen.

■ Although the verdict form did not allow the jury to make separate findings on mental anguish, diminished earning capacity, physical impairment or medical care, dollar amounts appear as notations beside each element of damages listed in the charge. Relying on the notations as indications by the jury of how it apportioned damages between the various elements, the City argues that there was no evidence or factually insufficient evidence to support the *amount* of damages awarded for mental anguish, loss of future earning capacity and medical expenses. These notations are irrelevant and cannot be considered on appeal. *See First National Bank in Dallas v. Zimmerman*, 442 S.W.2d 674, 678 (Tex. 1969); *Mills v. Jackson*, 711 S.W.2d 427, 429–31 (Tex.App.—Fort Worth 1986, no writ).

Considering the "global" submission of the damage question, one cannot tell how the jury apportioned past and future dam-·

ages between the various elements. *See Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263, 268 (Tex.App.—Beaumont 1987, no writ). However, because the attack is directed at the evidence supporting a large award of past or future mental anguish and loss of future earning capacity, certain general principles apply.

First, these types of damages are always uncertain and not susceptible to exact calculation or proof. *Moore v. Lillebo,* 722 S.W.2d 683, 686 (Tex.1986) (mental anguish); *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943) (impairment of future earning capacity). Their determination was necessarily left to the jury's own experience, empathy, sound discretion and judgment. *See Moore,* 722 S.W.2d at 686 (quoting *Connell v. Steel Haulers, Inc.,* 455 F.2d 688, 691 (8th Cir.1972)); *McIver,* 169 S.W.2d at 712.

However, the jury could not base its verdict on conjecture. *See McIver,* 169 S.W.2d at 712. When faced with the task of proving damages incapable of exact proof, all Hester had to do was produce the best available evidence. *See Vance v. My Apartment Steak House, Etc.,* 677 S.W.2d 480, 484 (Tex.1984). If the evidence provided a reasonable basis for assessing his damages, then the City could not escape liability merely because the amount could not be exactly determined. *Id.*

Second, mental anguish is inherent in certain types of torts. *St. Elizabeth Hosp. v. Garrard,* 730 S.W.2d 649, 653–54 n. 5 (Tex.1987). For example, a simple battery may produce emotional trauma even without a physical injury. *Fisher v. Carrousel Motor Hotel, Inc.,* 424 S.W.2d 627, 630 (Tex.1967). This is because the injury is largely emotional and the recovery sought is primarily for emotional and not physical injury. *Moore,* 722 S.W.2d at 685–86; *Fisher,* 424 S.W.2d at 630. However, mental distress must amount to more than mere fear, anger or sorrow to be compensable. *Moore,* 722 S.W.2d at 690 (Spears, J., dissenting) (on rehearing).

Hester was sexually assaulted without his consent. If mental anguish is inherent in a simple battery, then Hester's forcible rape proximately resulted in some emotional trauma. *See Fisher,* 424 S.W.2d at 630. Proof of the rape itself was some probative evidence of mental anguish. *See Moore,* 722 S.W.2d at 686 (holding that proof of a family relationship was some evidence of the parents' emotional trauma resulting from their son's death). Under the circumstances, the evidence was legally sufficient to submit this element to the jury. *Id.*

Dr. Shinder, a psychologist with experience in counseling rape victims, described how a male rape victim is sometimes viewed by others: "A male victim is viewed as a powerless individual who in many respects ... is thought of as possibly being ... an effeminate individual who either provoked or didn't have the ability to prevent the assault." Hester described the incident as a "humiliating" experience, "extremely hard to talk about," and described himself after the attack as lethargic and reclusive, not wanting to do anything or go anywhere. He took a job in Galveston to just "get out of town." Although acknowledging that Dr. Shinder had helped him put his life "back together" and to "get on with it," he claimed that he still had a "sense of humiliation" and would never forget the rape.

Other witnesses also provided evidence of his emotional trauma. Another inmate saw him crying and vomiting immediately after the attack. His family described him as "upset," "embarrassed," "afraid" that his friends would learn of the incident, and observed him change from an "outgoing" person to one who "just held it in and laid around most of the time." His mother could still see her son's "hurt and humiliation" at the time of the trial. Hester's father said his son "clammed up" and stayed at home more, but got "a little better" after he entered counseling with Dr. Shinder in September 1987.

Dr. Shinder, who found that Hester's "self concept had taken a real beating" as a result of the sexual assault, described him as embarrassed, feeling guilty, withdrawn, and contemplating suicide. He was "confused" and became nauseated, trembled and cried when he talked to Shinder

about the incident. Shinder, who was concerned that Hester might harm himself because of his emotional trauma, predicted that the rape "will be with him for the rest of his life."

However, there was some evidence that Hester, a ninth-grade "dropout," was emotionally alienated from his family and had anti-social problems before the sexual assault, that after the attack he had established two sexually satisfying female relationships while working in Galveston, and that he did not appear upset when a detective questioned him about the incident the day after it occurred. Furthermore, Hester admitted that he had answered "No" on an employment application, which inquired whether he ever suffered a serious injury, and had denied being sexually assaulted when questioned about the incident by a friend.

A psychological injury can be as debilitating as a serious physical injury. *Garrard,* 730 S.W.2d at 653. Mental anguish is a symptom of "deep inner feeling of pain and hurt often borne in silence." *Moore,* 722 S.W.2d at 686 (quoting *Connell,* 455 F.2d at 691). Considering all of the evidence, the jury could have reasonably concluded that Hester's overt symptoms represented a deep, chronic, psychological scarring that proximately resulted from the sexual assault.

Placing a value on Hester's emotional trauma was a task for the jurors to accomplish based upon their own experience, empathy, sound judgment and discretion. *See id.; McIver,* 169 S.W.2d at 712. The evidence of mental anguish was factually sufficient to support an award of $102,000 as past damages or an award of $150,000 as future damages, or both. Thus, any complaint about an excessive award for past or future mental anguish cannot be sustained. *See Armellini Exp. Lines of Florida v. Ansley,* 605 S.W.2d 297, 310 (Tex.Civ.App. —Corpus Christi 1980, writ ref'd n.r.e.).

Moreover, the record contains probative evidence of Hester's employment history both before and after the rape. Although unemployed when the incident occurred, he worked briefly in "fast food" establish-ments and a restaurant both before and after the incident, and briefly at a poultry-processing plant, a Wal–Mart store, and an air conditioning company following the rape. Hester was within four months of completing a welding course in a Job Corps program in Arkansas at the time of the trial.

Dr. Shinder explained that the "major life trauma" had reduced Hester's ability to cope with future stressful situations, and predicted that he would have trouble handling the "routine stresses that other people seem readily to deal with." Unlike most people, who can lose a job without having a major life crisis, Shinder said that Hester was "devastated" by the loss of his job at the air conditioning company after the assault. He described his reaction to stress as being similar to the post-traumatic disorders experienced by Vietnam veterans. When asked whether the homosexual rape would affect Hester's future earning capacity, Shinder based his reply on reasonable psychological probability:

> Stress is going to be a key factor.... His ability to deal with stress has been diminished.... Now when you talk of earning ability, I think there is a direct relationship between how much money certain jobs pay and the amount of stress that goes with those. And I certainly would never recommend ... a trauma victim who is dealing with the issues that are a part of that at that point in their life to consider a high job stress. It's like giving them a loaded gun.

Determining the amount that Hester might earn in the future was inherently speculative and best left to the jury. *See McIver,* 169 S.W.2d at 712. Exact proof of his prior or future earnings was not required. *Id.* Although past or future earnings were not exactly shown, the record nevertheless contained evidence of his age, education, mental capabilities, past employment history, potential, as well as the nature, severity and extent of his emotional distress. Thus, the evidence was factually sufficient for the jury in its sound discretion to award him $150,000 for impairment of his future earning capacity. As there

**820**

was some probative evidence to support this award, any complaint that the jury awarded excessive future loss of earnings is without merit. *See Ansley,* 605 S.W.2d at 310.

An award of $102,000 as past damages was supported by factually sufficient evidence of mental anguish, standing alone. Likewise, the $150,000 awarded for future damages was supported by factually sufficient evidence of either mental anguish, loss of future earning capacity or a combination of both.

Hester's judgment against the City was for $270,416.13 in damages, plus post-judgment interest, costs, and $97,500 in attorney's fees. However, he was only entitled to a judgment against the City under the Tort Claims Act, not under § 1983. Effective September 2, 1987, the Tort Claims Act was amended to raise a municipality's maximum liability for bodily injury from $100,000 to $250,000 for each person. *Compare* TEX.CIV.PRAC. & REM.CODE ANN. § 101.023(b), (c) (Vernon 1986 and Vernon Supp.1990). The increased limit, applicable to all suits filed on or after September 2, 1987, allowed Hester a maximum recovery of $250,000 because his suit was filed on September 3. Furthermore, Hester was not entitled to attorney's fees because the Tort Claims Act does not provide for their recovery and he was not a "prevailing party" under § 1988. *See* 42 U.S.C.A. § 1988 (West 1981).

Hester was entitled to a judgment but not in the amounts awarded. The judgment was erroneous because it awarded him damages in excess of $250,000, the City's maximum liability under the Tort Claims Act, and awarded him attorney's fees when there was no basis for their recovery. However, the judgment can be reformed to provide for the proper recovery. *See* TEX.R.APP.P. 80(b)(2).

The judgment is reformed to delete all recovery of attorney's fees by Hester and to reduce his recovery of damages from $270,416.13 to $250,000. Likewise, a take-nothing judgement is rendered against Hester on his § 1983 cause of action against the City. All other portions of the judgment shall remain undisturbed. The reformed judgment is affirmed.