Victor ALVARADO and Olga
Alvarado, Appellants,

v.

The CITY OF BROWNSVILLE, Appellee.

No. 13–91–357–CV.

Court of Appeals of Texas,
Corpus Christi.

Aug. 31, 1993.

Rehearing Overruled Nov. 10, 1993.

Carter C. White, San Francisco, CA, Ed Stapleton, Costilla & Stapleton, Brownsville, for appellants.

William S. Helfand, J. Preston Wrotenbery, Tina Snelling, Hirsch, Glover, Robinson & Sheiness, Houston, for appellee.

Before GILBERTO HINOJOSA, PAUL W. NYE,* and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

Appellants, the parents of Ricardo Alvarado, brought a wrongful death and survival action against the City of Brownsville after Ricardo Serna Alvarado committed suicide in the city jail. Appellants challenge the jury's verdict in favor of the City by thirteen points of error, including the sufficiency of the evidence to support the jury's verdict, the trial

* Former Chief Justice, retired April 30, 1993.

court's submission of the charge, and the trial court's exclusion of certain evidence. We reverse and remand.

On November 10, 1988, Ricardo Serna Alvarado, a nineteen-year-old, committed suicide in the Brownsville City Jail by hanging himself with a jail-issued blanket. He had been arrested for driving while intoxicated after causing a one-car automobile collision. Earlier that day, he had skipped class from high school and gone "cruising" and beer drinking with friends. Family and friends testified that Ricardo did not normally skip school. The evidence showed, however, that Ricardo was somewhat agitated that day because a young woman for whom he felt great affection had refused to accept flowers from him.

Officer Jose Angel Rodriguez was the arresting officer at the scene of the collision. He had administered field sobriety tests and determined that Ricardo was intoxicated. According to Officer Rodriguez, Ricardo refused the intoxilizer exam, but otherwise was cooperative and did not appear to be crying, upset or suicidal. However, Officer Rodriguez also testified that the personal history and arrest record prompting the post-arrest interview with Ricardo did not require an explicit determination of whether Ricardo was suicidal.

Ricardo was booked at the Brownsville City Jail at 2:32 p.m. and was found hanging in his jail cell at approximately 7:20 p.m. Ignacio "Nacho" Perez and Javier Elizondo were the jailers on duty that evening. Perez testified that Ricardo was alone in the detoxification cell, or "drunk tank," when he arrived on duty at 2:40 p.m., and that four other detainees were in the other cells.

Jailers Perez and Elizondo gave conflicting testimony regarding Ricardo's mental state and his degree of intoxication. Jailer Perez testified that Ricardo lay still with his back to the cell door during the entire four hours he was in the "drunk tank," indicating a high degree of intoxication. Perez also testified that, although Ricardo had refused dinner, he appeared "fine" when he made a cell check at 6:50 p.m. He stated that Ricardo was not violent, angry, or crying during the entire time he was in the cell. However,

Perez admitted that he would not have known if Ricardo had been crying since he did not see his face and he never actually elicited a response from him.

In contrast to Jailer Perez' testimony, Jailer Elizondo testified that he never saw Ricardo lying down. Elizondo stated that Ricardo was seated on the concrete ledge in his cell. Elizondo also testified that he had the opportunity to speak with Ricardo at the front of his cell when Ricardo declined to make his phone call and that Ricardo did not appear to be crying or suicidal.

The evidence shows that, on the evening of Ricardo's suicide, the jailers did not adhere to the jail policy of conducting cell checks every twenty minutes. Jailer Perez made a cell check at approximately 6:40 or 6:50 p.m., but Jailer Elizondo did not make the next scheduled cell check. Instead, a "de facto" cell check occurred when Perez delivered an arrestee to a cell at 7:20 p.m., leading to the discovery of Ricardo's body. Neither Perez nor Elizondo administered CPR while waiting for the paramedics to arrive.

Jailers Perez and Elizondo justified their failure to make the requisite twenty-minute cell check by explaining that it was their understanding that booking procedures took priority over cell checks. They testified that the scheduled cell check was not made because, at 7:11 p.m., Perez and Elizondo were booking two arrestees. The "booking" procedure required approximately ten to twenty minutes to strip-search, fingerprint, photograph and register the arrestees. During the "booking" procedure, the jailers allowed the view of the men's drunk tank from the booking station to be obstructed by the door leading to the cell block.

The record reflects that jail policy would have allowed the postponement of booking procedures while a cell check was conducted. Section 209(e) of the Jail Procedures Manual for the City of Brownsville, Texas, in effect at the time of the suicide, states that "[w]hen several prisoners are brought in at the same time all but the one being booked should be placed in a secure cell or detention tank after a thorough search of the prisoner has been accomplished." Elizondo stated that his un-

derstanding of the booking procedure was that jailers were required to finish the booking procedure once it was started.

At trial, appellants introduced the Jail Procedures Manual for the City of Brownsville, Texas, as evidence that, at the time of Ricardo's death, the City had formulated a two-part safety policy that encompassed suicide prevention. First, § 210 of the Manual stated that "[t]he health and well-being of prisoners in the city jail is the sole responsibility of the City." Second, § 301 of the Manual stated, "[t]he on duty jailer will observe each prisoner at least every twenty (20) minutes. Observations should be more frequent for prisoners who are potentially suicidal, mentally ill, or have demonstrated violent behavior. These observations are to be recorded in the Jailer's log book."

Because the trial judge excluded several of appellants' theories of liability and related evidence, the sole theory of negligence submitted to the jury was that the City breached its self-imposed duty to care for inmates in that the jailers failed to make the scheduled twenty-minute cell checks required by the Jail Procedures Manual. The jury found that the City was not negligent and that Ricardo's "negligence or intentional conduct" proximately caused his own death.

■ In their first point of error, appellants argue that the jury's failure to find that the City of Brownsville was negligent and proximately caused Ricardo's death is against the great weight and preponderance of the evidence and is manifestly unjust. When reviewing a factual sufficiency point, an appellate court considers and weighs all of the evidence that tends to prove, as well as evidence that tends to disprove, the existence of vital facts. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). However, it is the jury's province, as the trier of fact, to judge the credibility of witnesses and the weight to be given their testimony. *Walter Baxter Seed Co. v. Rivera*, 677 S.W.2d 241, 244 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). The finding by the trier of fact will be upheld unless the evidence is too weak, or the finding is so against the great weight and preponderance

of the evidence as to be manifestly erroneous or unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634–35 (Tex.1986).

■ The City had a twenty-minute cell-check policy to maintain the health, safety and well-being of inmates. The evidence shows that the jailers failed to implement that policy in that a "de facto" cell check was made at 7:20 p.m., which was ten-to-twenty minutes after the scheduled cell check. However, Jailers Perez and Elizondo testified that they understood that the jail policy was to prioritize booking over cell checks. The jury was instructed that negligence means the "failure to do that which a person of ordinary prudence would have done under the same or similar circumstances." Applying this definition to the evidence presented to the jury, and giving deference to the jury's evaluation of the credibility of the witnesses, we hold that the jury's finding is not against the great weight and preponderance of the evidence. *Pool*, 715 S.W.2d at 634–35; *Rivera*, 677 S.W.2d at 244. Appellants' first point of error is overruled.

■ In their second point of error, appellants argue that the trial court erroneously submitted question two of the charge over their timely objection. Question two asked, "Do you find by a preponderance of the evidence that the negligence or intentional conduct of Ricardo Alvarado proximately caused his own death?" The jury was then instructed to answer question three if it had found that "the negligence and/or intentional conduct of both the City of Brownsville and Ricardo Alvarado caused the death in question." Question three asked the jury to apportion between the City and Ricardo "the percentage of the negligence or intentional conduct that caused the death."

The trial court erred when it submitted question two to the jury because appellees were prohibited by law from asserting Ricardo's suicide as a defense. Section 93.001 of the Texas Civil Practices and Remedies Code prohibits the use of a plaintiff's suicide as a defense if the suicide was caused in whole or in part by a defendant's breach of a legal

duty.[1] Tex.Civ.Prac. & Rem.Code § 93.-001(a)(2) (Vernon Supp.1993). The basic premise of appellants' cause of action was that Ricardo's suicide was caused to some degree by the City's negligence. Accordingly, we hold that the trial court abused its discretion by submitting question two.

■■■ We now must determine whether the improper submission of question two amounts to reversible error. Tex.R.App.P. 81(b)(1). The improper submission of charge questions constitutes reversible error when, considering the charge as a whole, harm is suffered by the complaining party. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749–50 (Tex.1980). The general rule is that error is harmless if the judgment is supported by the jury's answers to other questions in the charge. Nonetheless, reversible error may exist if an erroneously submitted question confuses or misleads the jury. *Id.*

■■■ We hold that the submission of question two, particularly when read in conjunction with questions one and three, confused and misled the jury. Ricardo's suicide was the nexus between the City's alleged negligence and the damages suffered by appellants, *i.e.,* Ricardo's alleged wrongful death. Appellants had to prove that Ricardo took his own life to entitle them to compensation. To have taken a fact that appellants were required to prove and turn and use it against them in some semblance of a comparative negligence cluster was extremely prejudicial, confusing and misleading. The focus of the charge should have been on the cause of Ricardo's suicide, and not the cause of Ricardo's death. Accordingly, the charge should have focused the jury's attention on the determination of whether the City was negligent in allowing Ricardo to commit suicide. Instead, it focused on the cause of Ricardo's death which, no one disputes, was suicide.

Appellants' second point of error is sustained.

■■■ In points of error twelve and thirteen, appellants argue that the trial court abused its discretion in refusing to submit appellant's requested instruction regarding negligence *per se*. Negligence *per se* is defined as the unexcused violation of a statute or ordinance which is designed to prevent injury to a class of persons to which the injured party belongs. *Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 549 (Tex.1985). However, appellants failed to demonstrate that the standard of care in the Manual constituted a penal statute, regulation or ordinance. Thus, negligence *per se* is inapplicable to the case at hand. Points of error twelve and thirteen are overruled.

■■■ In points of error three through eleven, appellants assert that the trial court committed reversible error when, based on the Texas Tort Claims Act (TTCA), it excluded certain evidence. The trial judge determines the admissibility of evidence. Tex. R.Civ.Evid. 104(a). The court's determination will not be overturned absent an abuse of discretion. *Steenbergen v. Ford Motor Co.*, 814 S.W.2d 755, 760 (Tex.App.—Dallas 1991, writ denied); *Garza v. Cole*, 753 S.W.2d 245, 247 (Tex.App.—Houston [14th Dist.] 1988, writ ref'd n.r.e.). In order to determine whether the trial court in this case abused its discretion when it ruled the evidence inadmissible under the TTCA, a thorough discussion of the relevant provisions of the Act, and case law interpreting it, is necessary.

Historically, municipalities were considered agents of the state of Texas and so shared the State's immunity from liability under the common law doctrine of sovereign immunity. Jones, C.D., *Texas Municipal Liability: An Examination of the State and Federal Causes of Action*, 40 Bay.L.Rev. 595,

---

1. **§ 93.001. Affirmative Defense**

(a) It is an affirmative defense to a civil action for damages for personal injury or death that the plaintiff, at the time the cause of action arose, was:

\* \* \* \* \* \*

(2) committing or attempting to commit suicide, and the plaintiff's conduct in committing or attempting to commit suicide was the sole

cause of the damages sustained; provided, however, *if the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard, then such a suicide or attempted suicide shall not be a defense.*

Tex.Civ.Prac. & Rem.Code Ann. § 93.001(a)(2) (Vernon Supp.1993) (emphasis added).

604 (1988). However, the State legislature granted a limited waiver of governmental immunity in the TTCA. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 101.001 et seq. (Vernon 1986 and Supp.1993). The Supreme Court of Texas has recognized that the TTCA calls for liberal construction to achieve its purposes. *Robinson v. Central Texas MHMR Center*, 780 S.W.2d 169, 170 (Tex.1989); *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 32 (Tex. 1983); *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex.1976).

■ Whether a governmental entity may be held liable involves a two-step analysis. The first step is whether the claim arises under one of three specific areas of liability. The second step is whether the claim lies within an exception to the waiver of sovereign immunity. The determination of a governmental entity's negligence will be made only after a claimant has cleared these two statutory hurdles.

■ The three specific areas of liability in which immunity has been waived are: (1) injury caused by an employee's use of a motor-driven vehicle, TEX.CIV.PRAC. & REM. CODE ANN. § 101.021(1); (2) injury caused by a condition or use of tangible personal or real property, TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(2); and (3) claims arising from premise defects, TEX.CIV.PRAC. & REM.CODE ANN. § 101.022. Section 101.0215, a recent addition to the TTCA, lists specific governmental functions for which a municipality may be liable. TEX.CIV.PRAC. & REM.CODE ANN. § 101.0215 (Vernon Supp.1993). Included in the list are "police and fire protection and control" and the "establishment and maintenance of jails." *Id.* § 101.0215(1) and (7). To hold a municipality liable pursuant to § 101.0215, however, case law and legislative history indicate that liability still must arise out of one of the three specific areas of liability contained in §§ 101.021 and 101.022 of the TTCA. *McKinney v. City of Gainsville*, 814 S.W.2d 862, 865 (Tex.App.—Fort Worth 1991, no writ).

The TTCA identifies several exceptions to the waiver of governmental immunity which limit a sovereign's exposure to liability. Two exceptions to the waiver of immunity are relevant to this case: 1) discretionary acts, or policy formulation, and 2) claims arising from the failure to provide or method of providing police protection.[2] TEX.CIV.PRAC. & REM. CODE ANN. §§ 101.055 & 101.056 (Vernon 1986).

## Condition or Use of Tangible Personal or Real Property

■ The waiver of sovereign immunity involved in this case pertains to the condition or use of tangible personal or real property. According to the TTCA, a governmental unit is liable for:

> personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas Law.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 1986). The Supreme Court of Texas has made it quite clear that the "property" in question need not be the instrumentality of the harm suffered by a claimant. In *Robinson, Salcedo,* and *Texas Dept. MHMR v. Petty*, 848 S.W.2d 680, 682 (Tex.1992), the Court held:

> the *proximate cause of the damages* for death or personal injury *must be the negligence or wrongful act of the officer* or employee acting within the scope of his employment or office. The negligent *conduct*, however, must *involve* "some condition or some use" of tangible property under circumstances where there would be private liability.

*Salcedo,* 659 S.W.2d at 33 (emphasis added).

The courts have liberally construed the "use or condition of tangible property" language which waives sovereign immunity. For example, negligent failure to furnish tangible property has been held to invoke § 101.021(2). *See Robinson,* 780 S.W.2d at 171 (MHMR's negligent failure to provide life preserver to known epileptic at lake brought case within purview of § 101.021(2)

---

**2.** Traditionally, "police protection" was a governmental function at common law. Jones at 604; Larkin, L.M., *The "Policy Decision" Exemp-* tion of the Texas Tort Claims Act: State v. Terrell, 32 BAYLOR L.REV. 403, 407 fn. 29 (1980).

such that governmental immunity waived); *Lowe,* 540 S.W.2d at 300 (negligent failure to furnish grade-school football player with knee brace within waiver of immunity arising from some condition or use of personal property). In addition, misuse of medical reports has been held to invoke § 101.021(2). *See Petty,* 848 S.W.2d at 682–83 (jury's determination that state mental health employees' negligent use or misuse of Petty's medical records was instrument of harm to Petty sufficient to satisfy nexus between employee negligence, property, and injury); *Salcedo,* 659 S.W.2d at 30 (government doctor's misreading and misinterpretation of graphs produced by electrocardiograph equipment). Finally, in *City of Waco v. Hester,* 805 S.W.2d 807, 815, "use" of a day room at a city jail to house a violent homosexual inmate with other male inmates was a claim arising out of the "use" of tangible property. The *Hester* court also stated that a steel door separating the day room from the prison guard's desk could have interfered with the jailers' auditory surveillance of inmate activities, and "use" of this door brought the claim within the purview of § 101.021(2). *Id.*

### Discretionary and Police Protection Exemptions from the Waiver of Sovereign Immunity

 Even if sovereign immunity is waived, the TTCA contains exceptions to the

waiver of sovereign immunity "to avoid a judicial review that would question the wisdom of a government's exercise of its discretion in making policy decisions." *State v. Terrell,* 588 S.W.2d 784, 787 (Tex.1979). Section 101.056 of the TTCA exempts from liability claims based on discretionary acts, or policy formulation.[3] TEX.CIV.PRAC. & REM. CODE ANN. §§ 101.056(1) & (2) (Vernon 1986). The crucial question in the determination of whether a governmental entity's conduct lies within the discretionary exemption provided in the TTCA is whether the allegedly negligent conduct involves policy *formulation* or policy *implementation.* *Terrell,* 588 S.W.2d at 787. In *Terrell,* the Supreme Court of Texas held that the state's policy of setting a maximum speed limit and detecting violators by the use of radar equipped patrol cars was a policy formulation decision for which the city could not be held liable. However, that a highway patrolman collided with another vehicle while attempting to cross a highway and apprehend a speeder was the implementation and not the formulation of policy and, therefore, the discretionary exemption did not apply. *Id.* Thus, a government's negligent formulation of policy is immune from liability. But, the negligent implementation of a policy will subject a government entity to liability.[4] *See also, Forbus v. City of Denton,* 595 S.W.2d 621, 623 (Tex.Civ.App.—

3. Specifically, § 101.056 exempts:

 (1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or

 (2) a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.

4. The Federal Tort Claims Act also contains a discretionary exemption. 28 U.S.C.A. § 2680(a) (1965). The literal language of § 2680(a) is quite broad, exempting the government from any claims based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Federal courts utilize a "planning-operational" distinction similar to the formulation-implementation distinction in the Texas Act. *See Downs v. United States,* 522 F.2d 990 (6th Cir. 1975); Larkin at 410. Like the Texas courts, the

federal courts have not necessarily found "planning" and "operational" activities mutually exclusive. Just because wrongful conduct results from the "planning level" of government, does not necessarily mean "operational" aspects of the wrongful conduct do not exist.

> While wrongs based upon activities of the government often result from "planning level" activity exempt from suit under the Federal Act, it is almost always possible to show "operational" aspects of the wrongful conduct to the extent that there are details to be carried out by subordinate personnel. Thus, courts finding negligence occurring *after* the government's exercise of discretion have found the "discretionary function" exemption not applicable, notwithstanding the general rule that even the negligent or wrongful exercise of discretion is exempt from liability.

Larkin at 412 (citing *Hambleton v. United States,* 87 F.Supp. 994 (W.D.Wash.1949), *rev'd on other grounds,* 185 F.2d 564 (9th Cir.1950)). Thus, like the Texas discretionary exemption, the issue when applying the federal discretionary exemp-

Fort Worth 1980, writ ref'd n.r.e.) (deciding whether to provide mattress to inmates was policy formulation, but once decision to provide mattress made, deciding what kind of mattress was policy implementation), *McKinney*, 814 S.W.2d at 865 (no duty existed to provide barricades at parade to protect spectators, but, once decision to provide barricades made, city would be liable for negligent decisions incidental to that policy).

 In addition to the discretionary exemption, § 101.055 of the TTCA exempts claims arising out of "the failure to provide or the method of providing police or fire protection." TEX.CIV.PRAC. & REM.CODE ANN. § 101.055(3) (Vernon 1986). The courts have narrowly construed this police protection exemption. "Police protection" is broadly defined as the prevention of crime and the apprehension, punishment and rehabilitation of criminals. *Jenkins v. State*, 570 S.W.2d 175, 179 (Tex.Civ.App.—Houston [14th Dist.] 1978, no writ). However, governmental entities are immune from liability *only* for injuries arising out of their failure to provide, or method of providing, services which are *integral* parts of police protection. *Cuddy v. Texas Dept. of Corrections*, 578 S.W.2d 522, 524 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). If an activity is merely *incidental* to police protection, the police protection exemption is inapplicable. *Id.* (procedure used by Texas Department of Corrections to clear paths in state park is incidental to police protection); *see also Norton v. Brazos County*, 640 S.W.2d 690, 692–93 (Tex.App.—Houston [14th Dist.] 1982, no

writ) (particular method of providing care and feeding of inmates, including maintenance of kitchen equipment, is only incidental to and not integral part of, rehabilitation of criminals); *Jenkins*, 570 S.W.2d at 179 (particular medical procedures used in penal institution incidental to prevention of crime or rehabilitation of criminals).

 Because § 101.056 is broader than § 101.055, the formulation-implementation analysis used to apply the discretionary exemption is also used to apply the police protection exemption.[5] *Terrell*, 588 S.W.2d at 787. Application of the formulation-implementation analysis narrows the scope of the police protection exemption considerably. Even if an activity can be characterized as an integral part of police protection, thereby falling within the police protection exemption, a government entity is still subject to liability if the police protection activity arises out of the negligent implementation of government policy.

A recent application of the discretionary and police protection exemptions to the TTCA occurred in *Hester*, 805 S.W.2d at 809. There, as discussed earlier, an inmate was raped by another male inmate in the prison day room. Evidence of the city's written policies requiring jail personnel to "protect inmates from harm" was introduced to prove that a policy had been formulated. *Id.* at 812. The failure to implement that policy was proved by evidence that the prison lacked adequate facilities for monitoring inmates, that jailers were allowed to watch

---

tion is not whether a particular government activity is either "planning" or "operational." The issue is whether "operational" aspects of the government activity exist, regardless of whether "planning" aspects are also part of the objectionable conduct.

**5.** The courts, however, have not always applied the policy formulation-implementation analysis to the police protection exemption. Historically, any act involving police protection, whether policy formulation or policy implementation, exempted a governmental entity from liability. *See County of Brazoria v. Radtke*, 566 S.W.2d 326, 330 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.) (training and supervision of deputy sheriff discretionary acts exempting city from liability); *Lloyd v. University of Texas*, 524 S.W.2d 958, 959 (Tex.Civ.App.—Beaumont 1975, writ ref'd n.r.e.)

(claimant had no cause of action when fell from police car during arrest for DWI); *Davis v. County of Lubbock*, 486 S.W.2d 109, 110 (Tex.Civ. App.—Amarillo 1972, no writ) (no cause of action for negligent failure to take belt from inmate when inmate was found hanging by belt in jail cell); Larkin at 406–09. However, in *Terrell*, the Supreme Court of Texas soundly rejected the blanket immunity applied in *Radtke*, *Davis* and *Lloyd*, holding that the police protection exemption applies only to claims arising out of the negligent formulation of government policy, and not to claims arising out of the negligent implementation of a formulated policy. *Terrell*, 588 S.W.2d at 789. Furthermore, the *Terrell* court criticized the reasoning used in *Radtke*, and no court has ever cited *Radtke* for the proposition that training and supervision are discretionary acts.

commercial television at the booking desk, that jailers were not given any training before being assigned to duty, and that jailers were forewarned that the assault might occur. The *Hester* court held that neither the police protection nor the discretionary exemption applied to the facts of the case. The court stated that the essence of Hester's allegations were that his injuries arose out of the negligent implementation of the city's policies. *Id.* at 813.

■■■ Turning now to points of error three through ten, we must determine whether the trial court erroneously excluded certain evidence under the TTCA. In their tenth point of error, appellants contend that the trial court pursuant to § 101.021(2) erroneously excluded evidence that the jailers did not receive CPR training or administer CPR on Ricardo. On the same grounds, appellants contend in their ninth point of error that Jailer Perez had a personal policy of unnecessarily isolating inmates to avoid what he perceived to be a potentially dangerous situation in which one of two inmates in an unlocked cell stands-by while a jailer gives the other one emergency care. The trial court ruled that neither CPR nor the isolation of inmates involved the condition or use of tangible personal or real property. However, as discussed earlier, § 101.021(2) of the TTCA does not require that the "property" in question be the instrumentality of the harm suffered by a claimant; nor must an employee's negligent conduct derive from the condition or use of tangible personal or real property. *Id.* The only requirement of § 101.021(2) is that an employee's negligent conduct *involve* the condition or use of tangible personal or real property.[6] Here, § 101.-021(2) has been invoked by the "use" of the drunk tank, and by the door blocking the jailers' view of the cell block from the booking desk. The drunk tank and the door may not have been the instrumentality of Ricardo's suicide, but the jailers' lack of CPR training and failure to administer CPR on Ricardo, and Jailer Perez' practice of isolating inmates, did *involve* the use of the drunk tank and the door. With respect to points of

error nine and ten, we hold that the trial court abused its discretion when it excluded this evidence on the grounds that it did not involve the condition or use of tangible property. *Steenbergen*, 814 S.W.2d at 760; *Garza*, 753 S.W.2d at 247.

■■■ Appellants also argued to the trial court that the evidence showing that the jailers failed to administer CPR to Ricardo was inadmissible because failure to administer CPR was not a cause of Ricardo's death. We disagree. Whether the failure to administer CPR was a proximate cause of Ricardo's death was a fact question for the jury. We further hold with respect to point of error ten that the trial court abused its discretion when it excluded this evidence on the grounds that it was not a cause of Ricardo's death. *Steenbergen*, 814 S.W.2d at 760; *Garza*, 753 S.W.2d at 247.

Appellants complain in points of error three through eight that the trial court erroneously excluded evidence on the grounds that the city activity in question fell within the discretionary or police protection exemptions of the TTCA. In point of error three, appellants argue that a memorandum and accompanying testimony were erroneously excluded under the discretionary exemption. The memorandum contained suggestions from Lieutenant Eliborio Rios to former Police Chief Andres Vega in response to a 1986 jail incident in which Moyers Joseph Burdette attempted to hang himself two times in one evening. In points of error four and five, appellants argue that the trial court erroneously excluded under the discretionary and police protection exemptions 1) testimony that the City's training program for the identification of potentially suicidal inmates was inadequate and 2) testimony that the City's method of screening for potentially suicidal inmates was inadequate. In point of error six, appellants argue that the trial court erroneously excluded under the discretionary exemption testimony that video cameras were placed in the "sally port" area where inmates were initially brought by ar-

---

6. In *Petty,* the court rejects the assertion by the Texas Department of Mental Health and Mental Retardation that "the only way Ms. Petty could

have been injured by the treatment records was if a large stack of them had fallen on her head." *Petty,* 848 S.W.2d at 682.

resting police officers, but were not placed in the detention areas of the jail. In points of error seven, eight and nine, appellants argue that the trial court erroneously excluded under the police protection exemption 1) the Texas Commission on Jail Standards, and accompanying testimony regarding the City's attempt and failure to meet such standards, 2) testimony that Jailer Elizondo had received poor employee evaluations, and 3) testimony that Jailer Perez had a personal policy of unnecessarily isolating inmates to protect himself from potential harm (also excluded under § 101.021(2), "tangible personal property").

■ As discussed earlier, a government entity is not shielded from liability for injuries arising out of "services which are only incidental to, and not integral parts of, the prevention of crime and the apprehension, punishment and rehabilitation of criminals." *Cuddy*, 578 S.W.2d at 524. For example, the care and feeding of inmates, *Norton*, 640 S.W.2d at 692–93, and the particular medical procedures used in a penal institution, *Jenkins*, 570 S.W.2d at 179, are services for which a penal institution may be liable because they are only incidental to police protection.

■ None of the evidence excluded under the police protection exemption—suicide prevention training and screening, the use of the Texas Commission on Jail Standards, Jailer Elizondo's poor employee evaluations, or Jailer Perez' personal policy of isolating inmates—is an integral part of police protection. It is merely incidental to police protection. Accordingly, we believe that the trial court abused its discretion when it excluded this evidence under the police protection exemption. *Steenbergen*, 814 S.W.2d at 760; *Garza*, 753 S.W.2d at 247.

■ Moreover, regardless of whether the evidence was excluded under the police protection exemption or the discretionary exemption, the propriety of the trial court's rulings is subject to the policy formulation-implementation analysis. Accordingly, the next issue we must determine is whether the evidence excluded under the discretionary or police protection exemptions pertains to allegedly negligent conduct involving policy *implementation*. *Terrell*, 588 S.W.2d at 787. We hold that it does.

The Jail Procedures Manual for the City of Brownsville, Texas, shows that the City had adopted a suicide prevention policy at the time of Ricardo's death. In § 210, the City accepts responsibility for the health and well-being of the prisoners in the city jail. In § 301, the City requires cell checks every twenty minutes, and more often for potentially suicidal prisoners. All these policies arguably were established to avoid incidents such as the one that resulted in Ricardo's death. All that remained was the implementation of those policies. The suggestions contained in the memorandum and accompanying testimony, the testimony that the City's suicide prevention training was inadequate, the testimony that the City's method of screening for potentially suicidal inmates was inadequate, the testimony that the placement of video cameras was insufficient, the testimony that the City had attempted and failed to meet the Texas Commission on Jail Standards, the testimony that Jailer Elizondo had received poor employee evaluations, and the testimony that Jailer Perez had a personal policy of unnecessarily isolating inmates were evidence of the implementation or failure to implement those policies. Accordingly, the trial court abused its discretion when it excluded this evidence under either the discretionary or police protection exemptions. *Steenbergen*, 814 S.W.2d at 760; *Garza*, 753 S.W.2d at 247.

Having determined that the trial court erred in excluding the evidence complained of in points of error three through ten, we now must examine the entire record to determine whether the error was harmless. We include in this harmless error analysis appellants' eleventh point of error, which asserts that the combined effect of the wrongful exclusion of the evidence complained of amounts to cumulative error.

■ The standard of review for the erroneous exclusion of evidence by the trial court was stated in *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989):

To obtain reversal of a judgment based upon error of the trial court in admission

or exclusion of evidence, the following must be shown: (1) that the trial court did in fact commit error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. This court will ordinarily not find reversible error for erroneous rulings on admissibility of evidence where the evidence in question is cumulative and not controlling on a material issue dispositive of the case. Thus, we must review the entire record.... (citations omitted)

See TEX.R.APP.P. 81(b); *Texas Dept. of Human Services v. White*, 817 S.W.2d 62, 63 (Tex.1991). When excluded evidence tends to prove a specific, discreet ground of negligence and the trial court excludes *all* evidence pertaining to that ground, error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Missouri–Kansas–Texas R.R. Co. v. May*, 600 S.W.2d 755, 756 (Tex.1980); *Western Co. of N. Amer. v. So. Pac. Transp. Co.*, 819 S.W.2d 952, 955 (Tex.App.—Austin 1991, no writ). To prevail on a cumulative error point, appellant must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a favorable verdict. *Sendejar v. Alice Physicians and Surgeons Hospital*, 555 S.W.2d 879, 888.

■ We hold that negligent training and negligent screening are discreet grounds of recovery. Because *all* of the evidence pertaining to those grounds was erroneously excluded, error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *May*, 600 S.W.2d at 756; *Western Co. of N. Amer.*, 819 S.W.2d at 955. Points of error four and five are sustained.

■ With respect to points of error three, six, seven, eight, nine, and ten, the following evidence was introduced by offer of proof. In the memorandum, Lt. Rios suggested, "Jailers should work together, we could use a padded cell, more training or supervision is needed for the jailers." The remainder of the two-page memorandum details Lt. Rios' observations regarding inadequate staffing during the Moyers incident. He stated that the female jailer on duty during the Moyers incident "hysterically" pointed out that Jailer Perez was working alone, i.e., Perez was the only male jailer on duty. The memorandum then states that Jailer Perez complained that "nobody went to help him" when he called for help, "that the [sic] he had to go help the prisoner that was trying to hang himself while another prisoner was also in the same cell and that he was in there alone and what if the other prisoner jumped him," and that "it took the supervisor a long time to get there—that he could be dead by the time they get [sic] there and that he was alone there."

Vegas testified that Lt. Rios recommended an on-site supervisor. Vegas also testified that no changes were made in response to Lt. Rios' memorandum during the two years between the "Moyers incident" and Ricardo's death. Vegas conceded that §§ 301 and 210 of the Manual addressing frequent observations of suicidal inmates and the health and well-being of the prisoners constituted City policies regarding suicide prevention.

With respect to suicide prevention training, the following evidence was excluded from the jury. Jailer Perez testified that none of the 830 hours of training he received at the Police Academy included instruction regarding jail suicide procedures and prevention. Jailer Elizondo testified that, even after the Moyers incident, he was not trained to recognize certain factors present in potentially suicidal inmates, such as intoxication. Jailer Elizondo's employee evaluation indicated that he was deficient in his knowledge of jail rules and regulations and that he had a "bad attitude."

Whether the jailers' failure to administer CPR was a proximate cause of Ricardo's death was also addressed in an offer of proof. Appellants' expert witness, Lindsey Hayes, testified that the Texas Commission on Jail Standards provides that one should always administer CPR to an unconscious individual with no pulse. Hayes testified that failure to administer CPR was negligence and a proximate cause of Ricardo's death because approximately six minutes passed between the time that Ricardo was discovered and EMS arrival.

Also excluded from the jury was Hayes' testimony with respect to screening for potentially suicidal inmates. He recommended and had with him at trial certain "receiving" forms which would help screen for potentially suicidal inmates. All of the "receiving" forms suggested by Hayes would have elicited detailed information from an inmate, permitting an educated determination of whether an inmate fit the profile of a potential suicide victim. Hayes testified that the form at the City jail that most closely resembled a suicide screening form was the "arrestee medical record." However, it was used by the City only when an inmate required medical treatment. Furthermore, the "arrestee medical record" did not address suicide prevention. Hayes testified that the failure to utilize detailed suicidal screening forms when processing inmates was negligence and a proximate cause of Ricardo's death.

Hayes also testified that the Texas Commission on Jail Standards requires all jails to medically screen inmates. Former Chief Jailer Carlos Ayala testified that, although the standards were not legally binding, the Brownsville City Jail used them as a "base" from which to operate, and tried to follow as many of the rules and regulations as they could.

Jailer Elizondo's poor employee evaluations were also introduced during an offer of proof. Chief Jailer Ayala testified that, in a 1986 employee evaluation, Elizondo received a "3" out of "5" under "knowledge of rules and regulations." In August, 1988, Ayala wrote a memorandum complaining that Elizondo had a bad attitude, that he had too many sick calls and missed a computer training session. Jailer Elizondo testified that he did not know CPR because he had missed the class.

All of this evidence was relevant to the implementation of policies which might have prevented the death of Ricardo. We therefore conclude that its exclusion was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Gee*, 765 S.W.2d at 396; *Sendejar*, 555 S.W.2d at 888. Points of error three, six, seven, eight, nine, ten, and eleven are sustained.

The trial court's ruling is REVERSED and we REMAND for a new trial.

PAUL W. NYE, Former Chief Justice not participating.