COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-286-CV
 
 
TEXAS DEPARTMENT OF TRANSPORTATION                           APPELLANT
 
V.
 
MARY G. ANDREWS, INDIVIDUALLY,                                       APPELLEES
MARY ELIZABETH ANDREWS CROCKETT,
INDIVIDUALLY, KATHRYN ANDREWS ANDERTON,
INDIVIDUALLY, AND CHARLEY J. ANDREWS, III,
INDIVIDUALLY, AND ALL AS REPRESENTATIVES
OF THE ESTATE OF CHARLEY JULIUS ANDREWS
 
 
------------
 
FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
Introduction
        Appellant, 
the Texas Department of Transportation (TXDOT), appeals from the trial court’s 
order denying its plea to the jurisdiction. See Tex. Civ. Prac. & Rem. Code Ann. §§ 
51.014(a)(8), 101.001(3)(A) (Vernon Supp. 2004-05). TXDOT contends that 
it is entitled to sovereign immunity from suit arising from a car accident on 
Highway 360. Appellees claim that the accident resulted from TXDOT’s failure 
to place warning signs and properly maintain traffic control devices in the area 
of the accident. Because we conclude that appellees did not raise a fact 
question as to whether TXDOT’s immunity from suit has been waived, we vacate 
the trial court’s order denying TXDOT’s plea to the jurisdiction and dismiss 
the claims against TXDOT.
Background Facts
        On 
October 30, 1999, appellee Mary G. Andrews and her husband, Charley Julius 
Andrews, were driving on Highway 360 when Mary drove onto a paved area (the 
“extension”) that ended in a fifteen-foot drop-off. Their car went off the 
embankment, and Charley, the passenger, was injured in the resulting crash and 
later died.
        Mary 
and the couple’s children, Mary Elizabeth Andrews Crockett, Kathryn Andrews 
Anderton, and Charley J. Andrews, III—individually and as representatives of 
the Estate of Charley Julius Andrews—sued TXDOT for negligence.[1]  Their claims fall into three general categories: (1) 
negligent design of the roadway and adjacent extension; (2) negligent failure to 
install and maintain appropriate traffic control devices before and around the 
extension to warn the public of the potential danger of the embankment; and (3) 
negligent failure to properly inspect and maintain the existing traffic control 
devices in the area after notice that they were inadequate.  Appellees 
alleged specifically that the embankment is a special defect, and in the 
alternative, that it is a premise defect.  TXDOT filed a plea to the 
jurisdiction alleging that it is entitled to sovereign immunity from suit, which 
the trial court denied. TXDOT filed this interlocutory appeal.
Standard of Review
        Sovereign 
immunity defeats a trial court’s subject matter jurisdiction; thus, it is 
properly asserted in a plea to the jurisdiction.  Tex. Dep’t of Parks 
& Wildlife v. Miranda, 133 S.W.3d 217, 225-26 (Tex. 2004).  When a 
plea to the jurisdiction challenges the pleadings, we determine if the pleader 
has alleged facts affirmatively demonstrating that the trial court has 
jurisdiction over the case.  Id. at 226.  We construe the 
pleadings liberally in favor of the plaintiffs and look to the pleader’s 
intent.  Id.
        “[I]f 
a plea to the jurisdiction challenges the existence of jurisdictional facts, we 
consider relevant evidence submitted by the parties when necessary to resolve 
the jurisdictional issues raised.”  Id. at 227; Bland ISD v. 
Blue, 34 S.W.3d 547, 555 (Tex. 2000).  If the evidence creates a fact 
question regarding jurisdiction, the trial court must deny the plea to the 
jurisdiction and leave its resolution to the fact finder.  Miranda, 
133 S.W.3d at 227-28.  But “if the relevant evidence is undisputed or 
fails to raise a fact question on the jurisdictional issue, the trial court 
rules on the plea to the jurisdiction as a matter of law.”  Id. at 
228.  In other words, “after the state asserts and supports with evidence 
that the trial court lacks subject matter jurisdiction, we simply require the 
plaintiffs, when the facts underlying the merits and subject matter jurisdiction 
are intertwined, to show that there is a disputed material fact regarding the 
jurisdictional issue.”  Id.
        We 
review the trial court’s ruling on a plea to the jurisdiction de novo.  Tex. 
Natural Res. Conservation Comm’n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 
2002).  “When reviewing a plea to the jurisdiction in which the pleading 
requirement has been met and evidence has been submitted to support the plea 
that implicates the merits of the case, we take as true all evidence favorable 
to the nonmovant,” indulging every reasonable inference and resolving any 
doubts in the nonmovant’s favor.  Miranda, 133 S.W.3d at 228.
        Here, 
TXDOT challenged both appellees’ pleadings and the existence of jurisdictional 
facts.  Thus, we must examine the evidence submitted by the parties to 
determine if appellees raised a fact question regarding jurisdiction.  See 
id.
Analysis
        Under 
the doctrine of sovereign immunity, the State and its agencies are generally 
immune from suit unless the State gives its consent to be sued.  Sipes 
v. City of Grapevine, No. 02-02-00323-CV, 2004 WL 1944454, at *3 (Tex. 
App.—Fort Worth Aug. 31, 2004, no pet. h.); Fed. Sign v. Tex. S. Univ., 
951 S.W.2d 401, 405 (Tex. 1997).  The State, a governmental unit, is immune 
from both suit and liability for appellants’ injuries unless its immunity is 
waived by the terms of the Texas Tort Claims Act.  See Tex. Civ. Prac. & Rem. Code Ann. 
§§ 101.021, 101.025 (Vernon 1997).
        In 
their second amended petition, appellees claimed that the portion of Highway 360 
where the accident occurred abruptly ends in a fifteen-foot embankment or 
drop-off.  They claim that there were no “signs, barricades, or other 
markers” warning Mary or other motorists of this road condition.  They 
further claim that the area was part of a “staged construction project” and 
that TXDOT breached a nondiscretionary duty to place and maintain traffic 
control devices in the area warning of the condition.  Finally, appellees 
claim that TXDOT was negligent in failing to properly inspect the area and in 
failing to correct the absence or condition of traffic control devices in the 
area within a reasonable time after notice of the absence or condition of the 
devices.  Thus, appellees’ claims fall into two broad categories: (1) 
that the condition of the area where the fifteen-foot drop-off is located 
constitutes a special defect; and (2) in the alternative, the area is a premise 
defect for which TXDOT had a nondiscretionary duty to provide and maintain 
adequate warnings and traffic control devices.  TXDOT challenged both 
categories of claims in its plea to the jurisdiction.
        Special Defect
        The 
Tort Claims Act waives a governmental unit’s immunity from suit and liability 
for violation of the duty to warn of special defects.  Tex. Civ. Prac. & Rem. Code Ann. § 
101.060(c); State v. Wollesen, 93 S.W.3d 910, 913 (Tex. App.—Austin 
2002, no pet.).  A special defect is a condition of the same kind or class 
as “excavations or obstructions on highways, roads, or streets” that 
unexpectedly and physically impair a vehicle’s ability to travel on the 
roadway, thus presenting an unusual and unexpected danger to users of roadways.  
Tex. Civ. Prac. & Rem. Code Ann. 
§ 101.022(b); State v. Rodriguez, 985 S.W.2d 83, 85 (Tex. 1999); Harris 
County v. Estate of Ciccia, 125 S.W.3d 749, 753 (Tex. App.—Houston [1st 
Dist.] 2003, pet. denied).  Whether a condition is a special defect is a 
question of law for the court. Rodriguez, 985 S.W.2d at 85; Ciccia, 
125 S.W.3d at 753.  To be a special defect, a condition must “be one 
which threatens normal users of a road even though such condition does not have 
to exist upon the surface of the roadway itself.”  Morse v. State, 
905 S.W.2d 470, 475 (Tex. App.—Beaumont 1995, writ denied); see Peterson v. 
City of Fort Worth, 966 S.W.2d 773, 775 (Tex. App.—Fort Worth 1998, no 
pet.).  A condition located so far from the roadway that vehicular 
passengers and other normal users of the roadway are unlikely to encounter it is 
not a special defect.  State Dep’t of Highways & Public Transp. v. 
Payne, 838 S.W.2d 235, 239 (Tex. 1992) (op. on reh’g); Morse, 905 
S.W.2d at 475.  Further, “a special defect must be something out of the 
ordinary course of events rather than a long-standard, routine, or permanent 
defect.”  Villarreal v. State, 810 S.W.2d 419, 422 (Tex. 
App.—Dallas 1991, writ denied); see Peterson, 966 S.W.2d at 776.
        Here, 
TXDOT presented evidence that in the area where the accident occurred, Highway 
360 does not end but instead gently curves to the right and transitions and 
becomes part of the frontage road.  The embankment was located at the end 
of approximately 1,000 feet of paved area, the extension, that does not curve 
but goes straight ahead and is separated from the main roadway by a solid, 
four-inch-wide yellow striped line that follows the curve of the roadway to the 
right.  The extension is not open to the public and was left as-is since 
1992 to serve as a tie-in for a future addition to Highway 360.  The 
extension does not have any roadway striping and, in contrast to the actual 
roadway, has no discoloration from traffic usage.  Orange plastic barrels, 
or drums, also divide the extension from the roadway as it curves along the 
yellow line to the right.
        The 
end of the extension itself is marked by a red and white barricade.  
Although it appears from photographs attached to the plea to the jurisdiction 
that the embankment at the end of the extension is not clearly visible from the 
beginning of the extension, the barricade is clearly visible.  TXDOT also 
presented evidence that while the part of Highway 360 where the accident 
occurred is part of a “phased construction project,” construction on this 
particular section was completed July 28, 1992 and approved by TXDOT August 7, 
1992, seven years prior to this accident.
        TXDOT 
contends that the embankment at the end of the extension is not a special defect 
because it would not be encountered by normal users of the roadway.  
Appellees contend they raised a fact issue regarding whether the extension was 
regularly used by motorists and not unintended for use by the public as TXDOT 
claims.
        TXDOT 
presented an affidavit from Lewis Rhodes, an engineer, indicating that from 1992 
to 1999 at least forty-seven million drivers had traveled past the roadway in 
the location of the accident.  In that time, only one other accident had 
occurred at the same location, and it involved alcohol.
        Appellees 
attached several deposition excerpts to their response to TXDOT’s plea to the 
jurisdiction.  One excerpt was from the deposition of Scott Peterson, a 
Euless police officer, who testified that police officers use the extension as a 
normal turnaround and that he uses it for that purpose probably ten times a day.  
He recalled another accident there involving a possible DWI and said he had 
heard of others, but no more than five.  In another deposition excerpt, a 
witness to Mary and Charley’s accident testified that the extension was 
“painted just like a regular road up to where it dropped off.”
        TXDOT 
contends that evidence of the volume of drivers passing by that location, the 
fact that only police officers routinely use the area, and that there have been 
only two to five accidents in that location, shows that the embankment at the 
end of the extension is not a condition encountered by normal users of the 
roadway.  We agree.
        The 
transportation code defines roadway as “the portion of a highway, other than 
the berm or shoulder, that is improved, designed, or ordinarily used for 
vehicular travel.”  Tex. Transp. 
Code Ann. § 541.302(11) (Vernon 1999).[2]  
While a witness to the accident indicated in deposition testimony that the 
extension was marked like a highway to where it dropped off, appellees presented 
no evidence disputing the existence of the yellow line, right-hand side road 
delineators, and barricade.  Even if evidence that police officers used the 
extension as a turnaround shows some “normal use” of the extension, that 
normal use is limited to turning around; thus, the embankment would never be 
encountered by a person using the extension for that purpose.  Further, 
TXDOT produced evidence showing that the condition of the roadway at the time of 
the accident conformed to TXDOT’s original design and had not been changed 
since the roadway had been completed in 1992.  See Villarreal, 810 
S.W.2d at 422.
        Viewing 
the evidence in the light most favorable to appellees, we conclude as a matter 
of law that the embankment is not a special defect.[3]
        Premise Defect
        In 
addition to claiming that the embankment is a special defect, appellees further 
contend that the embankment is a premise defect for which TXDOT is liable.  
A governmental entity’s liability for a premise defect that is not a special 
defect is limited. Immunity is not waived for premise defects that arise out of 
the governmental entity’s performance or nonperformance of discretionary 
functions.  Tex. Civ. Prac. & 
Rem. Code Ann. § 101.056; Sipes, No. 02-02-00323-CV, 2004 WL 
1944454, at *4.  More specifically, the Tort Claims Act does not waive 
sovereign immunity for
 
(1) the failure of a governmental unit initially to place a traffic or road 
sign, signal, or warning device if the failure is a result of discretionary 
action of the governmental unit; or
 
(2) the 
absence, condition, or malfunction of a traffic or road sign, signal, or warning 
device unless the absence, condition, or malfunction is not corrected by the 
responsible governmental unit within a reasonable time after notice; or
 
(3) the 
removal or destruction of a traffic or road sign, signal, or warning device by a 
third person unless the governmental unit fails to correct the removal or 
destruction within a reasonable time after actual notice.
 
Tex. Civ. Prac. & Rem. Code Ann. § 
101.060(a); Rodriguez, 985 S.W.2d at 85.
        Because 
roadway design is a discretionary function, sovereign immunity is not waived for 
flawed roadway design.  Rodriguez, 985 S.W.2d at 85; Ciccia, 
125 S.W.3d at 753.  The installation of safety features, such as barricades 
and signs, is part of a governmental unit’s discretionary roadway design.  
State v. Miguel, 2 S.W.3d 249, 251 (Tex. 1999); City of El Paso v. 
Ayoub, 787 S.W.2d 553, 554 (Tex. App.—El Paso 1990, writ denied) (holding 
that design, placement, and upgrading of barricades is an exercise of 
discretionary power).
        TXDOT 
contends in its appeal that the trial court erred in dismissing its plea to the 
jurisdiction because appellees’ claims attempt to hold TXDOT liable for 
performing discretionary activities.  Appellees claim that TXDOT failed to 
comply with a nondiscretionary duty to provide certain warnings in accordance 
with the federal and state Manuals on Uniform Traffic Control Devices and the 
State Department of Highways Barricade and Construction Standards.
Texas Manual on 
Uniform Traffic Control Devices
        Appellees 
and the dissent claim that, although roadway design is generally a discretionary 
activity, TXDOT failed to comply with the Texas Manual on Uniform Traffic 
Control Devices, which requires the use of certain warning signs and other 
traffic control devices for dangers such as the embankment.  Appellees 
claim this duty is nondiscretionary.  The dissent incorrectly implies that 
compliance with the Texas Manual is mandatory, and is therefore nondiscretionary.  
But the Texas Manual does not set legal standards for liability under the Tort 
Claims Act.  See State Dep’t of Highways & Pub. Transp. v. King, 
808 S.W.2d 465, 466 (Tex. 1991).  The statute authorizing implementation of 
the Texas Manual indicates that TXDOT may implement the standards imposed 
therein.  Tex. Transp. Code Ann. 
§ 544.002 (Vernon 1999).  Thus, any decision by TXDOT to alter the warning 
devices set forth in the Texas Manual was discretionary.  See id.; King, 
808 S.W.2d at 466.  We hold that any alleged failure by TXDOT to comply 
with the Texas Manual on Uniform Traffic Control Devices did not result in a 
waiver of immunity under section 101.060(a)(1).  Tex. Civ. Prac. & Rem. Code Ann. § 
101.060(a)(1).  Additionally, because TXDOT’s duty to comply with the 
Texas Manual is discretionary, the dissent has incorrectly characterized 
compliance under the manual as a mandatory duty.  See King, 808 
S.W.2d at 466.
Federal Manual on 
Uniform Traffic Control Devices
        Appellees 
also contend that TXDOT had a mandatory duty under the federal Manual on Uniform 
Traffic Control Devices to erect warning signs and barricades.  However, 
appellees offered no evidence indicating that the federal manual imposed any 
mandatory duties on TXDOT.
        The 
standards in the federal manual apply to “any highway project in which Federal 
highway funds participate.” 23 C.F.R. § 655.603(a) (2004).  Appellees 
presented evidence that federal highway funds were used in connection with the 
construction of the roadway and extension where the accident occurred.  
However, appellees presented no evidence showing that the roadway and extension 
do not conform to the standards set forth in the federal manual.
        TXDOT 
presented excerpts from the federal manual. Section 1A.09 provides that 
“[t]his Manual describes the application of traffic control devices, but shall 
not be a legal requirement for their installation.”  Following that 
section, a subsection entitled “Guidance” states as follows:
 
The decision to use a particular device at a particular location should be made 
on the basis of either an engineering study or the application of engineering 
judgment.  Thus, while this Manual provides Standards, Guidance, and 
Options for design and application of traffic control devices, this Manual 
should not be considered a substitute for engineering judgment.
 
        The 
appellees attached to their response to TXDOT’s plea to the jurisdiction 
excerpts from the federal manual.  The excerpt regarding warning signs 
states that “[t]he determination of the sign or signs to be erected shall be 
on the basis of an engineering study using the following sections as 
guidelines.”  This indicates that the ultimate decision regarding 
placement of the signs is left to the discretion of the engineers.
        Also 
attached to appellees’ response is “Figure 6-2“ from the federal manual, 
which depicts the placement of warning signs and barricades on a closed road 
with a detour, similar to the one at issue in this case.  But, again, 
nothing indicates that the items shown on the diagram are mandatory.  The 
title of the diagram is “Typical application of traffic control devices on a 
2-lane highway where the entire roadway is closed and a bypass detour is 
provided.”  The excerpted page that discusses barricades and channeling 
devices indicates that barricades “may be used to mark” the end of a 
roadway and that “[t]raffic cones and tubular markers are sometimes 
used outside of construction and maintenance areas for general traffic control 
purposes.” [Emphasis added.]
        The 
excerpts provided by appellees do not show that TXDOT had a nondiscretionary 
duty to place certain warning signs and other traffic control devices in the 
area around the accident site; all decisions were to be made in accordance with 
engineering judgment.  Accordingly, we conclude that any failure by TXDOT 
to comply with the federal Manual on Uniform Traffic Control Devices did not 
result in a waiver of immunity under section 101.060(a)(1).  Tex. Civ. Prac. & Rem. Code Ann. § 
101.060(a)(1).
Barricade and 
Construction Standards
        Finally, 
appellees contend that TXDOT had a mandatory duty to comply with, or force the 
contractor who built the road to comply with, the State Department of Highways 
and Transportation Barricade and Construction Standards, which they attached to 
their response.  They claim the standards are incorporated into the 
construction contract between TXDOT and the contractor.  However, appellees 
did not produce any portion of the contract or any other authority showing that 
either TXDOT or the contractor was required to abide by these standards.  
Furthermore, TXDOT presented deposition testimony from two TXDOT engineers 
indicating that the contractor completed construction of the project in 
accordance with the plans and specifications attached to the contract.  
Thus, we conclude that appellees did not raise a fact issue as to whether the 
standards imposed any mandatory duty on TXDOT.
Absence or Removal of 
Traffic Signs, Signals, or Warning Devices
        Appellees 
also claim that TXDOT had a duty to maintain the barrels blocking the extension, 
that it was negligent in its inspection of the barrels, and that it failed to 
correct misalignment of the barrels within a reasonable time after notice.  
Appellees presented evidence that the barrels were frequently knocked apart and 
that perhaps only two barrels placed far enough apart for a car to drive through 
were present on the day of the accident.  They also presented evidence that 
responsibility for placement of the barrels was a maintenance function for which 
TXDOT was responsible.
        TXDOT 
presented an affidavit from the Assistant Maintenance Section Supervisor for 
TXDOT, who indicated that he and other TXDOT employees “regularly patrolled 
the area to check for barrels that may have been dislodged and to insure that 
general alignment was maintained.”  In addition, he stated that he had 
driven past the area between 8:00 and 9:00 a.m. on the morning of the accident 
and “observed that the delineation barrels were aligned and in place.”  
He further stated that “[f]rom the Friday before to the Monday following the 
accident, no member of the public and no TXDOT employee is known to have 
observed or reported any dislodged barrel in the subject transition area.”
        Appellees 
presented evidence that TXDOT did not have a routine inspection policy regarding 
the barrels, only an informal inspection policy.  A maintenance supervisor 
drove past the area every morning on his way to work and “hopefully he would 
notice” if the barrels were out of proper alignment.  The dissent asserts 
that the majority’s conclusion regarding this issue is based on disputed 
evidence because the condition and position of the barrels on the day Andrew’s 
car entered the barricade were disputed.  However, appellees presented no 
evidence that TXDOT knew the barrels were out of alignment on the day of the 
accident or that TXDOT did not follow its inspection policy on the day of the 
accident.
        A 
governmental entity retains its immunity for decisions involving the negligent 
formulation of policy, but not the negligent implementation of policy.  See 
Mogayzel v. Tex. Dep’t of Transp., 66 S.W.3d 459, 465 (Tex. App.—Fort 
Worth 2001, pet. denied).  Thus, appellees cannot show that TXDOT’s 
immunity has been waived with respect to the policy of inspection that it had in 
place regarding the barrels, whether informal or not.  Furthermore, 
appellees presented no evidence showing that TXDOT did not follow the procedure 
that was in place.
        Although 
appellees presented evidence indicating that the barrels were frequently knocked 
apart and had to be realigned, they presented no evidence raising a fact 
question as to whether TXDOT had notice that the barrels were out of alignment 
within a reasonable time before the accident.  In addition, they presented 
no evidence that the frequent misalignment of the barrels prevented them from 
performing their function of informing drivers at highway speeds not to enter 
the extension.[4]  See Lawson v. Estate of 
McDonald, 524 S.W.2d 351, 356 (Tex. Civ. App.—Waco 1975, writ ref’d 
n.r.e.) (concluding that condition of traffic control device “refers to the 
maintenance of a sign or signal in a condition sufficient to properly perform 
the function of traffic control for which it is relied upon by the traveling 
public”).  Thus, appellees failed to raise a fact question as to whether 
TXDOT’s immunity under section 101.060(a)(2) had been waived.  Tex. Civ. Prac. & Rem. Code Ann. § 
101.060(a)(2).  Because the appellees only raised issues of fact relating 
to formulation of the inspection policy and failed to present any evidence to 
raise a fact issue as to whether TXDOT failed to comply with that policy, the 
dissent has incorrectly characterized the majority’s holding as an activity 
involving implementation of policy.
        Because 
appellees failed to raise a fact question as to (1) whether TXDOT had a 
nondiscretionary duty to place and maintain warning signs and other traffic 
control devices in the accident area and (2) whether TXDOT had notice of the 
misalignment of the barrels within a reasonable time before the accident—and 
because we hold as a matter of law that the embankment at the end of the 
extension is not a special defect—we hold that the trial court erred in 
denying TXDOT’s plea to the jurisdiction.  We sustain TXDOT’s issue on 
appeal.
Conclusion
        Having 
determined that the trial court erred in denying TXDOT’s plea to the 
jurisdiction, we vacate the trial court’s order and dismiss appellees’ 
claims against TXDOT.
 
 
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE
  
 
PANEL B:   LIVINGSTON, 
DAUPHINOT, and WALKER, JJ.
 
DAUPHINOT, J. filed a dissenting opinion
 
DELIVERED: September 23, 2004

 

 
COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-286-CV
 
 
TEXAS 
DEPARTMENT OF TRANSPORTATION                           APPELLANT
 
V.
 
MARY 
G. ANDREWS, INDIVIDUALLY,                                       APPELLEES
MARY 
ELIZABETH ANDREWS CROCKETT,
INDIVIDUALLY, 
KATHRYN ANDREWS ANDERTON,
INDIVIDUALLY, 
AND CHARLEY J. ANDREWS, III,
INDIVIDUALLY, 
AND ALL AS REPRESENTATIVES
OF 
THE ESTATE OF CHARLEY JULIUS ANDREWS
 
 
------------
 
FROM 
THE 141ST DISTRICT COURT OF TARRANT COUNTY
 
------------
 
DISSENTING OPINION
 
------------
        The 
majority holds that, although TXDOT undertook to install and maintain 
appropriate traffic control devices before and around the extension in question, 
it is immune from suit because this activity involves formulation of policy, not 
implementation of policy.  I disagree.
        In 
general, the courts of this state have held that decisions made at a policy 
level instead of an operational level are exempt as policy decisions.[1]  The Supreme Court of Texas pointed out that the 
deciding question is whether the allegedly negligent conduct involves policy 
formulation or policy implementation.[2]  That 
is because a governmental entity’s negligent formulation of policy is immune 
from liability, while the negligent implementation of a policy will subject the 
entity to liability.[3]  This rule corresponds 
to the rule that once a government has decided to perform a discretionary act, 
the act must be performed in a non-negligent manner.[4]
        Whether 
a governmental entity’s actions fall within its discretionary power is a 
question of law for the court to determine.[5]  
Texas courts are in agreement that "[m]aintenance activities undertaken at 
the operational level are not discretionary functions and are not immune from 
liability."[6]
        The 
record before us reflects that sections 3F-1 and 6C-8 of the Texas Manual on 
Uniform Traffic Control Devices require that type III barricades, consisting of 
three horizontal rails with appropriate markings used to control traffic, be 
used in the following situations:
 
1. Roadway ends in a dead end or cul-de-sac with no outlet.
2. 
A ramp or lane closed for operational purposes.
3. 
The permanent or semipermanent closure or termination of a roadway.
 
Drums 
or barrels, on the other hand, are typically channeling devices used to direct 
traffic into the appropriate lane.
        Nonetheless, 
TXDOT chose to block the closed roadway with drums, not barricades.  
Afterward, TXDOT’s daily maintenance and inspection of the drums, which they 
admit is required, consisted of hoping the maintenance supervisor would notice 
the placement of the drums on his way to work.  TXDOT’s reason for the 
necessity of a daily inspection was that it expected some of the drums to get 
damaged and knocked apart frequently.
        Mark 
Schluter, an area engineer for TXDOT, testified:
 
Q. Okay.  But the reason you inspect them every day is because you expect 
some of them to get damaged and knocked apart and lost?
 
A. 
Yes, sir.
 
Q. 
All right. But yet on this roadway, even though you’re only using channeling 
devices in a fifty-mile-an-hour interstate freeway system, there is no routine 
inspection to see that they are put back in alignment every day.  Is that 
what you’re telling the jury?
 
A. 
No, sir.  Actually, the maintenance supervisor comes in every morning to 
work, so hopefully he would notice that.
 
Q. 
Well, I would like to hope that myself, sir, but what records do I have to show 
this jury that in fact it was done?
 
A. 
Don’t have any.
  
Q. 
So it’s just trust me, believe me, I love you?  Is that it?
 
A. 
Yes, sir.
 
        The 
condition and placement of the barrels at the time the Andrewses’ car entered 
the extension was disputed.  Eyewitness Michael Samuel Houston testified:
 
Q. Were you aware of the presence of barrels or barricades at -- on 360 just at 
the part where the road transitions to the right?
 
A. 
Yes, at times -- I don’t know if they were there when this crash occurred or 
not.
 
Q. 
Okay.
 
A. 
But I know in the past I have seen barrels there --
 
Q. 
Okay.
 
A. 
-- and possibly, you know -- I do remember at one point, and I’ve driven this 
road since 1993 when I first moved here, maybe three barrels across with a rope 
across.  On this day, I -- there was no rope.  There may have been a 
barrel or two, but I don’t know.  I can’t tell you.
 
Q. 
Did you have the impression that the barrels were not in proper alignment on 
this particular day?
 
A. 
Oh, yeah.
 
Q. 
Okay.
 
A. 
Yeah, because the, the van just, you know, went straight up, up the hill there 
--
 
        Marilyn 
Ruth Hall, who witnessed the Andrewses’ entry into the extension and fall from 
the end of the pavement, testified:
 
Q. Did you see some barricades or some sort of device in the area where Ms. 
Andrews’ vehicle went?

                . 
. . .
 
A. 
There was two big sand barrels but they were spaced way far apart.  They 
should have been spaced a lot closer together and there was a barricade at the 
end of the -- I guess ramp, you would call it.  And that was just like a 
goal post ramp, kind of.
 
Q. 
Did you actually see the sign at the end of the ramp?
 
A. 
There was no sign.  There was the barricade
 
Q. 
You also indicated that you had mentioned to your daughter or someone prior to 
this accident, that this location is very confusing?
 
A. 
Yes.
 
Q. 
And tell us again, ma’am, the Judge and jury, why you feel like this 
particular location is confusing?
 
A. 
Well, just the way the road veers that way.  It’s -- to me it’s very 
confusing and I don’t understand why they did it.
 
Q. 
Okay.
 
A. 
It’s not marked good enough to keep people out of there.
 
 
        The 
majority says that we should look only to the condition of the barricade at the 
end of the extension and not to the condition of the devices for preventing 
entry.  I disagree, and, at best, the majority’s conclusion is based on 
disputed evidence.  The majority bases its position on TXDOT’s argument 
that the injury occurred 1000 feet from the entrance to the extension.  The 
Andrewses’ contention is that part of the problem is that motor vehicles were 
not adequately protected from inadvertent entry into an uncompleted extension 
that ended in a fifteen-foot drop-off.  The speed limit at the entry to the 
extension was fifty miles per hour.  A car traveling at that speed would 
reach the end of the extension in approximately fifteen seconds.  Allowing 
for braking time, the danger to a vehicle entering the extension was imminent.
        Police 
Officer Scott Peterson testified:
Q. Okay. How 
many other vehicles, to your, your personal knowledge, have driven off the 
embankment, the concrete down into the dirt below?
 
A. 
I can only state one for sure --
 
Q. 
Okay.
 
A. 
-- other accident that I have knowledge of that has happened there.
 
Q. 
Okay. Isn’t it true that you’ve heard about a couple of more since the 
freeway opened?
 
A. 
I have heard of others, yes.
 
Q. 
Okay.  And when you say others, would that be two or three or --
 
A. 
It’s not a large number.  I’ve heard from other officers that have made 
comments, not only in our city but by Fort Worth officers that work that area, 
that they have worked accidents, but they’ve never indicated a number or how 
many, and I haven’t ever seen a report to reflect that.
 
Q. 
Okay.  Based upon your general knowledge, would you say that that would be 
somewhere in the neighborhood of a couple or more to a maximum of five more 
vehicles that have driven off?
 
A. 
I would say --
 
 
MR. PEARCE: Objection to the form of the question. Subject to that, go ahead and 
answer.
 
A. 
I would say that would be an accurate assumption.
 
Q. 
Okay.  An accurate reflection on the -- what the import of these -- the 
meaning of what these other officers have told you, even though you’re not 
going to pin it down because you can’t?
 
A. 
Right.
 
Certainly, 
based on the record before us, TXDOT did not establish immunity.  Because 
there are disputed issues of fact regarding jurisdiction, the trial court did 
not err in denying TXDOT’s plea to the jurisdiction.  For these reasons, 
I must respectfully dissent from the majority’s opinion.  I would affirm 
the trial court’s denial of TXDOT’s plea to the jurisdiction and would hold 
that Appellees are entitled to their day in court.
 
 
                                                  LEE 
ANN DAUPHINOT
                                                  JUSTICE
 
 
DELIVERED: 
September 23, 2004

 
NOTES
 
MAJORITY OPINION NOTES
1.  
Appellees also sued the contractor who constructed that portion of Highway 360.
2.  
A highway is defined as “the width between the boundary lines of a publicly 
maintained way any part of which is open to the public for vehicular travel.” Id. 
§ 541.302(5).
3.  
Appellees provided evidence raising a fact question as to the placement and 
number of barrels between the extension and the roadway at the time of the 
accident. Even taking as true the evidence that there were only two barrels 
placed far enough apart for a car to travel through, we conclude that, in light 
of the yellow line and barricade, the distance between the roadway and the 
embankment, and that the condition of the extension is of a longstanding nature, 
the embankment does not constitute a special defect.
4.  
Just as we do not believe that evidence that police officers used the extension 
as a “normal turnaround”—and that, out of approximately 47 million drivers 
passing that area between 1992 and 1999, two to five may have entered the 
extension and had accidents there—shows that the embankment constituted a 
danger to normal users of the roadway, we likewise do not believe that the same 
evidence raises a fact issue regarding whether any misalignment of the barrels 
prevented the barrels from performing their intended function.
 
DISSENTING OPINION NOTES
1.  
McKinney v. City of Gainesville, 814 S.W.2d 862, 866 (Tex. App.—Fort 
Worth 1991, no writ).
2.  
State v. Terrell, 588 S.W.2d 784, 787 (Tex. 1979).
3.  
Alvarado v. City of Brownsville, 865 S.W.2d 148, 156 (Tex. App.—Corpus 
Christi 1993), rev'd on other grounds, 897 S.W.2d 750 (Tex. 1995).
4.  
Norton v. Brazos County, 640 S.W.2d 690, 693 (Tex. App.—Houston [14th 
Dist.] 1982, no writ).
5.  
McKinney, 814 S.W.2d at 867.
6.  
Mitchell v. City of Dallas, 855 S.W.2d 741, 745 (Tex. App.—Dallas 
1993), aff'd, 870 S.W.2d 21 (Tex. 1994).